STATE of Minnesota, Respondent,

v.

Mark Antonio PROFIT, Appellant.

No. C4–97–1600.

Supreme Court of Minnesota.

March 18, 1999.

454

John M. Stuart, MN State Public Defender, John G. Westrick, Marcia McDowall-Nix, Special Asst. Public Defender, St. Paul, Robert D. Miller, Special Asst. Public Defender, Minneapolis, for appellant.

Michael Hatch, Attorney General, St. Paul, Amy Klobuchar, Hennepin County Attorney, Linda K. Jenny, Assistant County Attorney, Minneapolis, for respondent.

## OPINION

PAUL H. ANDERSON, Justice.

A jury found Mark Antonio Profit guilty of two counts of first-degree murder and one count of intentional second-degree murder for the May 1996 killing of Renee Bell. At the same jury trial, the jury also found Profit guilty of second-degree criminal sexual conduct and attempted first-degree criminal sexual conduct for an August 31, 1996 assault on Phynnice Johnson. The court sentenced Profit to two consecutive life terms. On appeal, Profit claims that the district court committed reversible error by (1) joining the Bell and Johnson charges for trial; (2) excluding evidence of a third party's possible involvement in allegedly similar crimes; and (3) permitting the state to amend the date of the offense on the Bell murder indictment after the close of testimony. Profit also asserts that there was insufficient evidence to support the jury's verdict with respect to the murder charges. We affirm.

On May 23, 1996, the nude body of Renee Bell, a 30–year–old African–American woman, was found floating in Basset Creek in Theodore Wirth Park in Golden Valley, Minnesota. What appeared to be an elastic waistband from an article of clothing had been wrapped around Bell's neck and was secured in a knot. One end of this ligature was also looped through Bell's mouth and under her tongue in a gag-like manner. Dr. Mitchell Morey, an Assistant Hennepin County Medical Examiner, performed an autopsy on Bell and concluded that Bell had been strangled with the ligature and that her death was a homicide. Dr. Morey concluded that Bell had been dead from one day to one week.

According to police, Bell was a reputed prostitute who frequented the Broadway Avenue area of Minneapolis. The autopsy revealed that Bell had ingested cocaine within a few hours before her death. Police investigators also observed that Bell's upper torso and vaginal areas were covered with mud. Police Sergeant Robert Krebs testified that the mud "appear[ed] to be packed, not just a matter of something [sic] had flowed over the body." Dr. Morey discovered mud inside Bell's vaginal vault as well, but found no other evidence of vaginal injury nor any indication of sperm or seminal fluid inside Bell's vaginal vault. Dr. Morey declined to rule out the possibility of sexual assault, however, stating that the decomposition of Bell's body and her submersion in water could have masked evidence of such an assault.

On July 13, 1996, Officer David Born of the Golden Valley Police Department found a wallet laying on the bank of Basset Creek a few feet from where Bell's body had been discovered. The water level of the creek had subsided since the discovery of Bell's body in May, causing the waterline to recede approximately eight feet. The wallet was found about one foot from the creek's edge and appeared to have been underwater. The wallet contained Profit's driver's license, as well as several papers subsequently linked to him.

Bell's body was just the first of several bodies to be found in or near Theodore Wirth Park during the summer of 1996. On June 3, 1996, the body of Deborah Lavoie was found approximately one and one-half blocks from where Bell's body had been discovered. On June 19, 1996, the body of Avis Warfield was found approximately one-half mile from Theodore Wirth Park. Both bodies had been burned with gasoline. On July 20, 1996, the body of Keooudorn Phothisane, a male transvestite, was discovered in Theodore Wirth Park within one and one-half blocks of where Bell's body had been found. Although Phothisane's body was also burned, police determined that he had been bludgeoned to death. Several juveniles claimed to have seen an African–American man running from the scene where Phothisane's body was found. The juvenile witnesses provided a composite sketch of the man to police. Profit is an African–American.

Each of these deaths, along with the Bell killing, was investigated by a multijurisdictional police task force under the premise that the deaths might be the work of a serial killer. Shortly after the discovery of Phothisane's body, this task force learned that a man named Paul Kelly had spoken to his employer about a letter allegedly concerning Phothisane's killing. The record does not indicate exactly what the employer told police or what Kelly had said to his employer, except to suggest that Kelly told his employer that someone else had written the letter.

Shortly after learning about the letter, the task force contacted and interrogated Kelly. Kelly told the police that Profit, his girlfriend's brother, had asked to borrow a gas can from him on July 20, 1996. Kelly said that Profit returned to Kelly's home one and one-half to two hours later and that Profit immediately proceeded to wash the clothes he had been wearing. According to Kelly, Profit then borrowed some clothes from Kelly and asked Kelly to help him wipe out the car Profit had been driving. Kelly also told investigators that he saw Profit write a letter confessing to the Phothisane murder. Kelly willingly provided handwriting and blood samples to the police. The police later learned that KARE 11 TV had received a letter similar to the one that Kelly described. This "KARE letter" was unsigned, but a handwriting analysis showed that Kelly was the most likely author. After being confronted with this information, Kelly admitted to writing the KARE letter, but said that he wrote the letter only after Profit showed him an original draft of the letter and ordered Kelly to rewrite the letter in his own handwriting in order to throw off authorities investigating the killing. The police continued to monitor both Kelly and Profit.

On August 2, 1996, while being monitored by the task force, Kelly contacted Profit by telephone and asked if Profit still had the clothes that he had borrowed on July 20, 1996. Profit told Kelly that he did, and he then returned clothes which matched the description of the clothes Kelly had told police Profit borrowed from him on the night of the Phothisane killing.

That same day, the police executed search warrants for Profit's home and the various vehicles driven by Profit or his family. In a 1990 Pontiac Grand Am known to be driven by Profit, investigators found threads and fibers similar to threads and fibers found on the ligature used to strangle Bell. Tests performed by a micro-analyst from the Bureau of Criminal Apprehension and a private analytic forensic microscopist revealed that the threads and fibers from the trunk were chemically and physically indistinguishable from the threads and fibers from the ligature.

On August 31, 1996, Phynnice Johnson was assaulted near Theodore Wirth Park. Johnson was an admitted crack cocaine user who, on August 31, had been working as a prostitute on Broadway Avenue in northeast Minneapolis. At about 11:00 p.m., a man in a car stopped to ask her where to get some crack cocaine. Johnson asked the man if he wanted her to ride with him to help him find some cocaine. The man agreed and Johnson then got into the car. The man then asked Johnson if she wanted to "party." She said yes, and the man then drove to an abandoned parking lot.

After smoking some crack cocaine with Johnson, the man unzipped his pants and asked her for oral sex. Johnson refused stating that she might do so later, but wanted to party first. The man then offered to take her to a park in south Minneapolis. When the man instead drove toward Theodore Wirth Park, Johnson became frightened and attempted to jump from the car. The man grabbed Johnson and, in the ensuing struggle, ripped off her T-shirt as she exited the car. The man followed Johnson and demanded she return the crack cocaine stem he had given her. The man then unzipped Johnson's pants and pulled them down around her ankles. He repeatedly told Johnson, "Bitch I'll kill you." The man then grabbed Johnson by her pants and tried to drag her across the street.

At that same time, Joan DeMeules and her husband, George Barrett, were driving home through Theodore Wirth Park and saw Johnson struggling with a man. DeMeules testified that she heard Johnson begging the man

to let her go. The couple yelled at the man to leave Johnson alone. When that proved ineffective, DeMeules exited the van and began hitting the man with an ice scraper. Barrett, armed with a bag of tomatoes, also exited the van and began hitting Johnson's assailant with the bag. Eventually Johnson, who by this time had been stripped of all her clothes, freed herself from the man and went to Barrett's van. The assailant went to his own car. After trying to salvage his smashed tomatoes, Barrett picked up Johnson's pants and returned to the van with DeMeules. Barrett then gave the partially-clothed Johnson his shirt to wear. DeMeules and Barrett asked Johnson what she wanted them to do. Because Johnson said she did not want to report the incident, DeMeules and Barrett drove her to the home of a friend.

In early October, Profit was arrested for the murder of Bell. Shortly thereafter, Johnson saw a picture of Profit on the news, recognized him as her assailant, and called the police. The police then issued public requests asking the two people who had assisted Johnson to come forward. DeMeules and Barrett saw Profit's picture in the newspaper and recognized him as Johnson's assailant. When DeMeules and Barrett heard on public radio that the police were looking for them, they contacted the police and provided statements. In separate photographic lineups, DeMeules and Barrett identified Profit as Johnson's assailant. At trial, Johnson, DeMeules, and Barrett again identified Profit as the man who had assaulted Johnson.

On October 29, 1996, Profit was indicted for two counts of first-degree murder and one count of second-degree murder in connection with the killing of Bell and, in a separate indictment, for one count of attempted first-degree criminal sexual conduct and one count of second-degree criminal sexual conduct in connection with the assault of Johnson. Pursuant to a motion by the state, the district court joined the two sets of charges for trial.

On April 16, 1997, in response to a defense petition, the district court issued a Certificate for Out–of–State Summons for Paul Kelly who had moved to Texas. Prior to trial, the state moved the court to exclude evidence of the Lavoie, Warfield, and Phothisane killings (purported serial killings) and "all testimony from/about Paul Kelly." The district court partially granted this motion. The court prohibited any mention of the purported serial killings or of the KARE 11 letter, but stated that "[i]f, in fact, Mr. Kelly has information relevant to the specific cases before us, * * * Mr. Kelly will obviously be allowed to testify. And relevance is the relevance to the facts that are going to be submitted, the issues before the Court on those two separate charges; not unrelated, uncharged offenses." The defense acknowledges that after the court's ruling it ceased any efforts to bring Kelly to Minnesota.

At trial, it was revealed that Profit had been in prison as a teenager and was released in 1981 at the age of eighteen. To support its claims that Profit killed Bell after sexually assaulting her and that he attempted to sexually assault Johnson, the state presented evidence of the following prior crimes committed by Profit after his release in 1981:(1) on September 2, 1981, Profit convinced a 15–year–old northeast Minneapolis girl to follow him to his apartment where he produced a knife, ordered her to get undressed, tied and blindfolded her, and raped her; (2) on September 10, 1981, Profit assaulted a woman at a north Minneapolis day care center where she worked, threatened the woman with a knife, tore off her clothes and tried to tie her with them, got on top of her and tried to kiss her, and was in the process of taking her out of the building when he was confronted by a parent and fled; and (3) on September 11, 1981, at a bus stop near Theodore Wirth Park, Profit forced a 16–year–old girl into his car, drove to an apartment on the north side of Minneapolis, told the girl to undress, and raped her. After pleading guilty to reduced charges, Profit served approximately 14 years in prison and was released in January 1996. Profit was in a halfway house until May 6, 1996, at which time he was released and moved in with his wife and her mother in Minneapolis.

The state also presented the testimony of a man who had been incarcerated in 1994 with

Profit. This witness said that Profit spoke to him about the importance of leaving no sperm or other source of DNA evidence behind after a rape. Another witness, a man who had been in a sexual offender treatment program with Profit in early 1996, testified about a conversation in which Profit said it was better to solicit rape victims of low socioeconomic stature because the police would be less likely to believe such victims. According to this witness, Profit also said he would go to "extreme measures" to destroy evidence in order to avoid another rape conviction.

After the close of testimony, the state moved to amend the date of the offense on the Bell indictment from "on or between May 21, 1996 and May 23, 1996" to "on or about May 21, 1996." The court granted the motion and instructed the jury using the amended date. On May 8, 1997, the jury returned a verdict convicting Profit on all counts. The court sentenced Profit to two consecutive life terms. On appeal, Profit argues that the verdict should be vacated or his convictions reversed because of the following alleged errors: (1) joining the Bell and Johnson charges for trial was prejudicially erroneous; (2) the trial court abused its discretion in excluding evidence of the purported serial killings and of Paul Kelly's possible involvement therein; (3) it was prejudicial error to amend the date of the offense on the Bell murder indictment after the close of testimony; and (4) there was insufficient evidence to support the jury's verdict of guilty on the murder charges.

## I.

■ Profit alleges that joinder of the Bell and Johnson charges for trial was reversible error. Because this case raises some confusion as to the appropriate standard to be applied in a joinder analysis, we must look at the joinder issue in some detail.

Joinder of criminal offenses is governed by Minn. R.Crim. P. 17.03. Rule 17.03, subd. 1 sets forth the general criteria for joinder, stating that "[w]hen the defendant's conduct constitutes more than one offense, each such offense may be charged in the same indictment or complaint in a separate count." Rule 17.03, subd. 4 allows the court, on motion from either party or on its own initiative, to join offenses that could permissibly have been charged in a single complaint or indictment under Rule 17.03, subd. 1. While the language of Rule 17.03, subd. 1 contains few express restrictions on joinder, the Advisory Committee comments following the rule state that the rule "adopts the provisions of Minn. Stat. § 609.035 (1971) leaving its judicial interpretations to judicial decision." Minn. R.Crim. P. 17.03, cmts. Minnesota Statute section 609.035 (1998), in turn, provides that "if a person's conduct constitutes more than one offense," all offenses must be joined in a single prosecution.

■ We have traditionally analyzed joinder using the same restrictive test we developed in applying Minn.Stat. § 609.035. *See State v. White*, 292 N.W.2d 16, 18 (Minn. 1980). Under both the rule and the statute, we have required that the joined offenses be part of a single behavioral incident or course of conduct. *See State v. Conaway*, 319 N.W.2d 35, 42 (Minn.1982); *White*, 292 N.W.2d at 18; *but see* Fed.R.Crim.P. 8(a) (allowing joinder of offenses of the "same or similar character"). The factors relevant to determining whether offenses constitute a single behavioral incident are the "time and place [of the offenses] and * * * whether the segment of conduct involved was motivated by an effort to obtain a single criminal objective." *State v. Knight*, 260 N.W.2d 186, 187 (Minn.1977) (citing *State v. Johnson*, 273 Minn. 394, 141 N.W.2d 517 (1966)).

In the present case, the state alleges that a 1990 amendment to Rule 17.03 implicitly relaxed the standards applicable to our joinder analysis. Prior to 1990, Rule 17.03 contained no express criteria for when improperly joined offenses must be severed. Instead, the rule merely provided that "offenses * * * improperly joined shall be severed for trial." Minn. R.Crim. P. 17.03, subd. 3 (1989). However, in 1990, subdivision 3(1) was added to Rule 17.03. Subdivision 3(1) sets forth the following express criteria for severance:

> On motion of the prosecuting attorney or the defendant, the court shall sever offenses or charges if:

459

(a) the offenses or charges are *not related;*

(b) before trial, the court determines severance is appropriate to promote a fair determination of the defendant's guilt or innocence of each offense or charge; or

(c) during trial, with the defendant's consent or upon a finding of manifest necessity, the court determines severance is necessary to achieve a fair determination of the defendant's guilt or innocence of each crime.

Minn. R.Crim. P. 17.03, subd. 3(1) (emphasis added).

Under the language added by Rule 17.03, subd. 3(1), a district court must first decide whether the joined offenses are related. If the court concludes that the offenses are not related, the court must then sever them for trial. Only if the offenses are found to be related does the court proceed to decide whether severance is nonetheless required because the joinder would be prejudicial. *See Conaway,* 319 N.W.2d at 42.

In the present case, the district court properly followed the sequence set forth in Rule 17.03, subd. 3(1). The court correctly noted that joinder is proper when the charged offenses are related, but that even related offenses must be severed if joinder would unfairly prejudice the defendant. Reasoning that "the similarities of the offenses indicate the presence of a common plan and objective," the court concluded that the Bell and Johnson offenses were related. The court then concluded that because evidence of each offense would be admissible as *Spreigl* evidence in a separate trial on the other, joinder was not prejudicial.

The confusion in this case arises from the use of the term "related" in Rule 17.03, subd. 3(1). Under our traditional joinder analysis, joinder of the Bell and Johnson charges would be improper because the offenses were not part of a single behavioral incident or course of conduct. The Bell and Johnson offenses were separate crimes against separate victims. Furthermore, several months passed between the commission of the Bell murder and the Johnson assault. *Cf. State v. Dukes,* 544 N.W.2d 13, 20 (Minn.1996) (af-

firming the joinder of separate crimes against separate victims when the crimes occurred within one block and fifteen minutes of each other). While the district court noted similarities in the modus operandi of the Bell and Johnson offenses, it made no findings that the offenses were motivated by a single criminal objective, or that either offense was dependent on or incidental to the other.

The state argues that by requiring severance only if the joined offenses are not "related," Minn. R.Crim. P. 17.03, subd. 3(1), loosened the traditional restrictive requirement that joined offenses be part of a single behavioral incident. Thus, the state asserts, the district court's finding that the Bell and Johnson offenses indicated a common plan was sufficient to warrant the denial of Profit's motion to sever the charges. The history of Rule 17.03 lends some support to the state's assertion.

The severance criteria of Rule 17.03, subd. 3(1) were taken from Unif. R.Crim. P. 472(a) (1987), which, in turn, is based on the ABA Standards for Criminal Justice 13–3.1(a) and (b) (1985). Minn. R.Crim. P. 17.03, subd. 3, cmts. Unlike our traditional interpretation of Rule 17.03, subd. 1, the only limits on joinder under the ABA Standards are that the offenses must be related and their joinder must not be prejudicial. ABA Standards 13–3.1. The ABA Standards define "related offenses" to include not only those offenses based on the "same conduct [or] upon a single criminal episode," but also those based "upon a common plan." ABA Standards 13–1.2. Thus, by adopting the wording of the ABA Standards, Rule 17.03, subd. 3(1) arguably permits less restrictive joinder than would be allowed under our traditional "single behavioral incident" requirement.

We have not yet addressed what, if any, effect Rule 17.03, subd. 3(1) had on our traditional joinder analysis. Our only substantial analysis of Rule 17.03 since subd. 3(1) became effective occurred in *Dukes,* 544 N.W.2d at 13. In *Dukes,* the district court joined for trial charges stemming from the murder of one victim and charges stemming from the attempted murder of a separate,

unrelated victim. *Id.* at 17. In upholding the district court's refusal to sever the charges, we continued to espouse the traditional joinder test without commenting on the provisions of Rule 17.03, subd. 3(1):

> In determining whether there should be separate trials for separate charges, we look to how the offenses were related in time and geographic proximity and at whether the actor was motivated by a single criminal objective. * * * Here, where the time between the two crimes was a matter of only a few minutes, the proximity was within one block, and each crime was motivated by the objective of obtaining money through robbery, the trial court did not abuse its discretion in refusing to sever the trials.

*Id.* at 20 (internal citations omitted).

■ We acknowledge that under some circumstances, considerations of efficiency and public policy may support a shift to less restrictive joinder standards, more in keeping with the standards espoused by the Federal Rules of Criminal Procedure and ABA Standards. But in light of our continued reliance on the traditional joinder analysis in *Dukes,* and absent a clearer amendment to the direction of Minn. R.Crim. P. 17.03, we decline to abandon our traditional joinder standards here. Under that traditional analysis, we require that joined offenses be part of a single behavioral incident and, therefore, the existence of a common plan, alone, is simply insufficient to support joinder. Accordingly, we hold that joinder of the Bell and Johnson charges was improper.

### Was Joinder Prejudicial?

■ Profit argues that if we conclude that the joined offenses are unrelated, then we must remand the case for separate trials. But "the ultimate question in a severance claim * * * is one of prejudice." *State v. Townsend,* 546 N.W.2d 292, 296 (Minn.1996) (quoting *United States v. Foote,* 920 F.2d 1395, 1401 (8 th Cir.1990), *cert. denied sub nom. Gardiner v. United States,* 500 U.S. 946, 111 S.Ct. 2246, 114 L.Ed.2d 487 (1991)). For that reason, even though joinder was improper, remand is not required if the district court's denial of the motion to sever was not prejudicially erroneous. *See Conaway,* 319 N.W.2d at 42; *Knight,* 260 N.W.2d at 187.

In *Conaway,* this court affirmed the district court's refusal to sever two charges, stating:

> While, as a matter of policy, joinder made sense in this case, it is stretching things to say that the two offenses were part of a single course of conduct. Although joinder may have been technically improper under the rule, it was not, however, prejudicial. The evidence of each offense would have been admissible *Spreigl* evidence in the trial of the other, and the trial court so held. * * * Thus, there was no prejudicial error in joinder.

*Conaway,* 319 N.W.2d at 42 (internal citations omitted). Thus, in *Conaway,* we did acknowledge the value of a *Spreigl* analysis in determining whether joinder is unfairly prejudicial. But it is important to note that the purpose of and the concerns raised by the joinder of criminal offenses are distinct from those involved in the admission of *Spreigl* evidence—evidence of other crimes or bad acts by a defendant offered to show identity, plan, knowledge, or modus operandi. *See generally State v. Spreigl,* 272 Minn. 488, 139 N.W.2d 167 (1965).

■ Profit correctly points out that if evidence of the Johnson attack had been offered as *Spreigl* evidence, the district court would have been required to provide limiting instructions to ensure that the jury did not use the evidence in an impermissible manner. *See State v. Bissell,* 368 N.W.2d 281, 283 (Minn.1985); *see also* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice,* CRIMJIG 2.01 (3d ed.1990). In *Spreigl* evidence cases, such limiting instructions are necessary to ensure that the jury does not convict the defendant of the uncharged *Spreigl* offense rather than for the crime with which the defendant was charged. But in joinder cases the defendant is actually charged with both crimes. When a defendant is charged with and may permissibly be convicted of both crimes, there is less danger that the jury will try to punish the defendant for one crime by convicting him of the other.

We do, however, recognize the inherent danger of district courts proceeding directly to a *Spreigl* analysis after paying only marginal attention to the traditional factors limiting joinder. We therefore remind the courts that if after careful analysis they conclude the joined offenses do not constitute a single behavioral incident or course of conduct, they are to sever the charges. While on appeal we ultimately look to whether the court's decision was prejudicial, we are certainly more likely to find prejudice when the joined offenses are unrelated in time, location, or objective. We therefore caution district courts not to rely on a *Spreigl* analysis to circumvent the traditional joinder analysis espoused by this court.

 That said, we proceed with our analysis to determine if the district court's refusal to sever the Bell and Johnson charges was prejudicially erroneous. Because our purpose on the appeal of both *Spreigl* and joinder issues is to determine whether the introduction of evidence of other crimes at trial was prejudicial, the analysis we have developed for *Spreigl* evidence serves as a useful framework for evaluating the possible prejudicial effect of improperly joining offenses. *See Conaway*, 319 N.W.2d at 37. The admissibility of *Spreigl* evidence is governed by Minn. R. Evid. 404(b) and subject to Minn. R. Evid. 403. *See Townsend*, 546 N.W.2d at 296. While such evidence may not be used to show the defendant acted in conformity with bad character, it may be admissible to show motive, intent, identity, or a common plan. *See* Minn. R. Evid. 404(b); *State v. Cogshell*, 538 N.W.2d 120, 123 (Minn.1995). Even if offered for such legitimate purposes, however, the evidence may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Minn. R. Evid. 403; *see also Townsend*, 546 N.W.2d at 296.

 In determining the probative value of evidence,

> the preferred approach is for the trial court to focus on the closeness of the relationship between the other crimes and the charged crimes in terms of time, place and modus operandi. * * * [T]he closer the

relationship, the greater is the relevance or probative value of the evidence and the lesser is the likelihood that the evidence will be used for an improper purpose.

*State v. Frisinger*, 484 N.W.2d 27, 31 (Minn. 1992) (internal citation omitted). While the modus operandi of the "other" crimes and charged crimes need not be identical, "[t]his court will readily uphold the admission of so-called 'signature crimes' to prove the identity of the perpetrator." *State v. Whittaker*, 568 N.W.2d 440, 449 (Minn.1997).

The record suggests that the Bell and Johnson offenses share a common modus operandi. The victims in both of the offenses were African–American women who, at least reputedly, worked as prostitutes in the same area of Minneapolis. Both victims ingested crack cocaine prior to their respective attacks. Both were transported to the same area in or near Theodore Wirth Park. Eyewitness accounts or physical evidence linked Profit to that area in both cases. Both of the victims were left naked. Given these similarities, the jury could reasonably infer that the same person committed the Johnson assault and the Bell murder.

 Because Profit made identity a relevant issue by presenting an alibi for both offenses, use of evidence that Profit committed one crime to imply that Profit also committed the other crime is legitimate. *See State v. Ture*, 353 N.W.2d 502, 515 (Minn. 1984) (holding that when the defendant put his identity at issue by offering an alibi, evidence of "strikingly similar" prior crimes committed by the defendant was admissible to show identity in the charged crime). While using the evidence to show identity was harmful to Profit, evidence is unfairly prejudicial, and thus excludable, only if used "to persuade by illegitimate means." *Townsend*, 546 N.W.2d at 296 (quoting *State v. Cermak*, 365 N.W.2d 243, 246 n. 2 (Minn. 1985)). Because, absent joinder, evidence of either crime could have been used for legitimate means in a separate trial on each charge, we hold that joinder, although improper under Minn. R. 17.03, was not prejudicially erroneous.

## II.

Profit also claims we should reverse his convictions because the district court excluded evidence of the purported serial killings and, specifically, of Paul Kelly's possible involvement in the Phothisane killing. Throughout the course of this litigation, Profit has relied on several different theories, including judicial estoppel, curative admissibility, and reverse-*Spreigl*, to show that this evidence was improperly excluded. While not all of these theories were briefed to the district court or to us on appeal, Minn. R.Crim. P. 28.02, subd. 11 gives us the power to review any "matter as the interest of justice may require." Given the important liberty interests at stake in this case, we will address each of Profit's various claims.

### *Judicial Estoppel*

In his initial response to the state's motion to exclude evidence of the purported serial killings, Profit argued that because, in securing search warrants and in presenting its case to the grand jury, the state alleged that the Bell murder was one of the purported serial killings, the state was judicially estopped from claiming that such evidence was irrelevant and therefore inadmissible at trial. The doctrine of judicial estoppel forbids a party from assuming inconsistent or contradictory positions during the course of a lawsuit. *See generally* 31 C.J.S. *Estoppel and Waiver* § 139 (1996). Unlike equitable estoppel, which protects the reliance interests of parties, the purpose of judicial estoppel is to protect the integrity of the judicial process from a party who plays "fast and loose with the courts." *Konstantinidis v. Chen,* 626 F.2d 933, 937 (D.C.Cir.1980). For judicial estoppel to apply, however, a party's subsequent position must be clearly inconsistent with its original position. *See Levinson v. United States,* 969 F.2d 260, 264 (7th Cir.1992); *Bay Area Factors v. Target Stores, Inc.,* 987 F.Supp. 734, 740 (D.Minn. 1997). Therefore, "[j]udicial estoppel does not apply * * * where distinct or different issues or facts are involved." 31 C.J.S. *Estoppel and Waiver* § 139; *see also Levinson,* 969 F.2d at 264.

We have not expressly recognized the doctrine of judicial estoppel and decline to do so here. The record contains no evidence that the state ever lied to or attempted to mislead any judicial body. Furthermore, because of their different purposes, grand jury and warrant application proceedings may legitimately involve different evidentiary and procedural considerations than are relevant to a trial on the merits. *See State v. Inthavong,* 402 N.W.2d 799, 801 (Minn.1987); *State v. Nolting,* 312 Minn. 449, 452–53, 254 N.W.2d 340, 343 (1977). Because of the differing nature of the proceedings and the lack of bad faith on the part of the state, we conclude that judicial estoppel, even if recognized, would be inapplicable in this case.

### *Curative Admissibility*

In his response to the state's motion to exclude evidence of his participation in the purported serial killings, Profit also alleged that, because the state introduced such evidence at the grand jury and warrant application proceedings, other evidence purporting to exonerate him of the purported serial killings should have been admitted at trial under the doctrine of curative admissibility. For curative evidence to be admitted as a matter of right, the original evidence must have been inadmissible and prejudicial. *See Thurman v. Pepsi–Cola Bottling Co.,* 289 N.W.2d 141, 144 (Minn.1980) (citing *Busch v. Busch Constr., Inc.,* 262 N.W.2d 377, 387 (Minn.1977)). Because the general rules of evidence do not apply to either the grand jury proceedings or warrant affidavits, Profit cannot make the requisite showing that the evidence introduced by the state at either proceeding was inadmissible. More importantly, because evidence of Profit's involvement in the purported serial killings was never presented to the petit jury, Profit suffered no prejudice at trial from the state's references to the purported serial killings in the grand jury and warrant application proceedings. Therefore, we conclude that the doctrine of curative admissibility is not applicable to the facts of this case.

### *Reverse–Spreigl*

Profit alleges that the district court impermissibly excluded evidence essential to

his defense. While on their face Profit's claims may appear persuasive, an analysis of the record leads us to conclude that: (1) the district court did not exclude nearly as much evidence as Profit asserts; and (2) based on the foundational evidence the court had before it, the court did not abuse its discretion in excluding the evidence that was suppressed.

■ "[E]very criminal defendant has the right to be treated with fundamental fairness and 'afforded a meaningful opportunity to present a complete defense.'" *State v. Richards*, 495 N.W.2d 187, 191 (Minn.1992) (citing *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)); *accord* U.S. Const. amend. XIV; Minn. Const. art. I, § 7. However, "the accused 'must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" *Richards*, 495 N.W.2d at 195 (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)). Thus, even when a defendant alleges that his constitutional rights were violated, evidentiary questions are reviewed for abuse of discretion. *See State v. Gustafson*, 379 N.W.2d 81, 84 (Minn. 1985).

Contrary to Profit's allegations, the district court did not prohibit him from asserting that Kelly killed Bell. Testimony concerning Kelly's access to the Grand Am and Profit's wallet was admitted, as was evidence that Kelly had left the state. In his closing argument, Profit's counsel reiterated the evidence linking Kelly to the Bell killing and argued that "[i]f you look closely at the evidence in this case there is more evidence * * * to suggest that Paul Kelly is involved in this case than there is Mr. Profit himself." Moreover, the district court did not prevent Kelly from testifying. In ruling on the state's motion in limine, the court said, "[i]f, in fact, Mr. Kelly has information relevant to the specific cases before us, * * * Mr. Kelly will obviously be allowed to testify."

Profit has admitted that the reason Kelly did not testify at trial was that the defense ceased its efforts to bring Kelly to Minnesota after the trial court's ruling on the state's motion in limine. Profit claims that there was no longer any purpose in bringing Kelly to Minnesota if he could not question Kelly about the KARE letter in which Kelly allegedly confessed to one of the purported serial killings—that of Phothisane.[1] But it must be remembered that the issue in the case was not whether Kelly was involved in the Phothisane killing. The issue was whether Profit killed Bell. Thus, evidence of the purported serial killings and Kelly's possible participation in the Phothisane killing is only relevant insofar as it tends to show that Profit did not murder Bell.

■ We have recognized that "a *defendant* may seek to introduce evidence of other crimes or misconduct of a *third person* to prove that the third person, rather than the defendant, committed the crime charged." *State v. Johnson*, 568 N.W.2d 426, 433 (Minn. 1997); *see generally* Minn. R. Evid. 404(b). Before such "reverse-*Spreigl*" evidence will be admitted, however, the defendant must show:

(1) clear and convincing evidence that [the third person] participated in the [reverse-]*Spreigl* incident; (2) that the [reverse-]*Spreigl* evidence is relevant and material to the [defendant's] case; and (3) that the probative value of the [reverse-]*Spreigl* evidence outweighs its potential for unfair prejudice.

*Johnson*, 568 N.W.2d at 433 (holding that the foundational requirements for reverse-

1. We find Profit's failure to subsequently subpoena Kelly as a witness despite the trial court's ruling puzzling in light of Profit's argument on appeal. Profit claims that evidence of Kelly's supposed involvement in the Phothisane murder and of the KARE letter were essential to his defense. Again, however, the issue at trial was not Kelly's guilt or innocence of the Phothisane killing, but Profit's guilt or innocence of the Bell murder. Therefore, evidence of Kelly's alleged participation in the Phothisane killing was irrelevant unless it was also possible that Kelly killed Bell. If there was any validity to Profit's claim that Kelly killed Bell, then summoning Kelly as a witness to testify as to his own whereabouts on the night of Bell's killing, his access to Profit's car and license, and other details of the Bell killing would certainly have been valuable to Profit's defense.

*Spreigl* evidence are the same as for traditional *Spreigl* evidence).

▬ "To satisfy the relevancy requirement when reverse *Spreigl* evidence is offered to establish the identity of the perpetrator, the reverse *Spreigl* incident must be similar to the charged offense either in time, location, or modus operandi." *Whittaker,* 568 N.W.2d at 449 (citing *Johnson,* 568 N.W.2d at 428). We acknowledge that the record reveals numerous similarities between the Bell murder and the purported serial killings and that the police investigation of the Bell murder as one of the purported serial killings indicates the crimes bore "signature" elements.[2] However, while such similarities may permit an inference that the same person committed all of the killings, this inference was of little value to Profit unless he also provided clear and convincing evidence that someone other than he—in this case, Kelly—committed the killings.

▬ Providing clear and convincing evidence of Kelly's participation in the Phothisane killing is a threshold requirement for the admission of that evidence. *See State v. Shannon,* 583 N.W.2d 579, 584 (Minn.1998). Clear and convincing evidence is "more than

a preponderance of the evidence but less than proof beyond a reasonable doubt." *Weber v. Anderson,* 269 N.W.2d 892, 895 (Minn.1978). The evidentiary burden is met when the truth of the facts sought to be admitted is "highly probable." *Id.* Clear and convincing evidence of participation in a crime has been found "on the strength of a conviction, a victim's clear identification of the defendant as the assailant, or the defendant's own confession of participation in the incident." *Shannon,* 583 N.W.2d at 584. We have refused to admit *Spreigl* evidence when the foundational evidence presented did not clearly show the person's direct participation in the other crime. *Id.*

▬ On appeal, Profit crafts a well-packaged argument attempting to link Kelly to the Phothisane murder. However, our function as a reviewing court is not to determine the factual merits of Profit's claim. That job belongs to the district court. Our function is to look at the evidence presented to the district court and determine whether, in light of the record, the district court clearly abused its discretion in suppressing evidence of the purported serial killings.[3]

2. The dissent finds the majority's reverse-*Spreigl* analysis "troubling" because of our earlier conclusion that joinder of the Bell and Johnson offenses was not prejudicial. We believe that the dissent misconstrues our analysis. We recognize that the purported serial killings may be just as, if not more, similar to the Bell killing than was the Johnson assault. However, regardless of how many signature elements the Bell killing and the purported serial killings share, the evidence of the serial killings is not relevant for the purposes for which Profit seeks to admit it absent a foundational showing, by clear and convincing evidence, that Kelly, and not Profit, killed Phothisane. It is on this foundational requirement that we focus our analysis.

3. We find it necessary to comment briefly on the burden of proof and standard of review in this case. In the past, this court and certain individual justices have suggested that there should be a higher burden for admitting reverse-*Spreigl* evidence than there is for *Spreigl* evidence. *See State v. Hawkins,* 260 N.W.2d 150, 159 (Minn. 1977) (holding that before evidence of past bad acts of a third party could be introduced, the defendant must make a foundational showing connecting the third party to the actual commission of the charged crime); *Johnson,* 568 N.W.2d at 438 (Tomljanovich, J., concurring specially).

While we need not decide here whether the defense should have a greater burden, our holding that the district court did not abuse its discretion in excluding the evidence of the purported serial killings is based on a recognition that the defense's burden in introducing reverse-*Spreigl* evidence should be no less than the state's burden in introducing *Spreigl* evidence. Had the state offered similar evidence against Profit as *Spreigl* evidence, the state would have been required to meet each element of the three-prong test and, in addition, would have had to abide by various procedural and notice requirements. *See Johnson,* 568 N.W.2d at 438; *State v. Bolte,* 530 N.W.2d 191 (Minn.1995). Yet, in seeking to admit evidence of the purported serial killings, Profit relied on a mixture of unrelated arguments including judicial estoppel and curative admissibility. The reverse-*Spreigl* theory was never formally briefed to the district court and was mentioned orally without prior notice. Therefore, we do not find the district court's lack of specific findings concerning each element of the reverse-*Spreigl* analysis as troubling as does the dissent. Rather, on appeal, our duty is to look to the record as a whole to determine whether, in light of the evidence therein, the district court acted "arbitrarily, capriciously, or contrary to legal usage." *Kroning v. State Farm Auto. Ins. Co.,* 567 N.W.2d 42, 46 (Minn.1997).

In analyzing the evidence that was actually presented at trial, we first note that Profit never briefed the reverse-*Spreigl* issue to the district court, but only raised the issue as an oral objection well after the court had already ruled on the state's motion in limine. More importantly, the evidence that Profit provided to the district court did little to support his claims that Kelly or anyone other than Profit committed the purported serial killings.

Profit offered very little evidence about Paul Kelly, the man whom he accuses of committing the purported serial killings. The record shows that the defense knew where Kelly was and had hired counsel in Texas to serve process on Kelly. Yet, although Profit alleges that evidence of Kelly's involvement in the purported serial killings was essential to his defense, he never brought Kelly to Minnesota to testify at the pretrial evidentiary hearing so that the district court could hear what Kelly would say. No formal statements from Kelly appear in the record. No testimony showing that Kelly had either the motive or the opportunity to kill Phothisane was offered. Instead, to support his claim that Kelly killed Phothisane and therefore Bell, Profit relies almost exclusively on (1) an alleged alibi for one of the purported serial killings, which alibi first surfaced on appeal, and (2) the KARE letter and police affidavits discussing the origins of the letter.[4]

On appeal, Profit claims that he had an alibi for the night of one of the purported serial killings. But Profit never raised this claim at trial, and on appeal he fails to cite any evidentiary support in the record for the claim. Because the district court never heard Profit's alibi claim, and because the claim is completely unsubstantiated by the record, we give little weight to the claim in our analysis of whether the district court abused its discretion.

■■■ Profit also relies on the KARE letter, which he calls a confession, as clear and convincing evidence that Kelly killed Phothisane. In the past, we have held that a confession by a defendant may be admitted as *Spreigl* evidence, even when that confession was subsequently retracted by the defendant. *See State v. Spaeth,* 552 N.W.2d 187, 195 (Minn.1996). In *Spaeth,* the defendant, as part of an arrangement set up by his attorneys and the police, provided a statement to the police admitting to two burglaries in return for the promise that he would not be prosecuted for those burglaries. *Id.* at 193. When the state subsequently sought to use those confessions as *Spreigl* evidence in a different case, the defendant denied committing the burglaries, saying he only confessed because he was pressured by the police into doing so. *Id.* at 194. At the hearing, however, the defendant's former attorney testified that the defendant was never required to speak to police about the burglaries and that no harm would have befallen him had he not confessed. *Id.* Thus, the validity of the confession admitted in *Spaeth* was supported by the fact that the confession itself was an express and unequivocal admission of guilt by the defendant and extrinsic evidence showing that the defendant's subsequent retraction of that confession was baseless.

In contrast to the *Spaeth* confession, the circumstances surrounding the KARE letter, at least insofar as they are reflected in the record, do little to ensure its validity. Because Kelly was not brought to Minnesota to testify and no witness testified as to the circumstances surrounding the KARE letter's creation, the only evidence in the record putting the KARE letter into context are police affidavits supporting warrants to search Profit's property.

The police affidavits show that Kelly wrote the KARE letter and that he provided police with information linking Profit to the crime. But despite the fact that both Profit and the dissent have labeled the KARE letter a confession, the affidavits indicate that Kelly nev-

---

4. In total, the handwritten KARE letter stated:
 I am writing about the the he she I kill Saturday I kill it because it was bad. I broke its neck and burned it I saw it on the TV and you thank I kill all them people but I did not I keep its clothes and purse for memories I have aids and I will die soon but until I do I will half got ride of all the bad people I want you to tell everybody that I am not bad
 God Bles you

er actually told anyone that he committed the Phothisane killing. According to the affidavits, even after he admitted to writing the unsigned KARE letter, Kelly told police that he wrote the letter only because Profit ordered him to do so. From the affidavits, it appears that the police investigated Kelly's story, believed him, and then relied upon Kelly's information to investigate and subsequently charge Profit. The affidavits indicate that the police suspected Profit, not Kelly, had committed the killings. Although Profit relies almost exclusively on these affidavits to put the KARE letter into context, he fails to offer any evidence to counter the affidavits' conclusions that Profit, not Kelly, was the serial killer.

Without any evidence of what Kelly would say if called to testify, the import of the KARE letter is further reduced. The KARE letter is an out-of-court statement offered to show that its author killed Phothisane. Thus, the letter is hearsay. *See* Minn. R. Evid. 801(c). As such, not only is the KARE letter's veracity inherently suspect, but the letter itself would be inadmissible except to impeach Kelly's testimony. Minn. R. Evid. 801(d)(1), 802. If Kelly was unavailable to testify, which Profit did not show, the KARE letter would not be admissible under any exception to the hearsay prohibition absent some independent guarantee of trustworthiness. *See* Minn. R. Evid. 804(b)(3) (providing that a hearsay statement against the declarant's interest is admissible only if the declarant is unavailable and "corroborating circumstances clearly indicate the trustworthiness of the statement"). Because the only evidence in the record supplying context to the unsigned, barely legible KARE letter was police affidavits suggesting that the letter was not what Profit asserted it to be, a confession by Kelly, the necessary indicia of trustworthiness were simply not present.

In addition to exposing the weaknesses in the KARE letter, the record contains additional, circumstantial evidence linking Profit, and not Kelly, to the purported serial killings. On cross-examination, Profit admitted that he had been familiar with Theodore Wirth Park. He grew up in that area and, in 1981, picked up one of his rape victims near

there. In addition, at the hearing on the motion in limine, the state indicated that Kelly had an alibi for the night of the Phothisane killing. While this claim was not detailed, let alone conclusive, the defense presented no evidence to counter the inferences suggested by the claim.

If the record contained additional or different evidence implicating Kelly as Phothisane's killer, our conclusion concerning the district court's exclusion of the KARE letter might well be different. However, taken as a whole, the record does more to suggest that Profit committed all of the purported serial killings than to show clear and convincing evidence that Kelly participated in any of them. In evidentiary matters, we accord great deference to the discretion of the district court. We refuse to second-guess the court based on the speculative and untrustworthy nature of the evidence contained in the record before us. Accordingly, we hold that the court did not abuse its discretion in excluding evidence of the purported serial killings.

### III.

■■■ After the close of testimony, the district court, pursuant to a motion by the state, changed the dates of the offenses on the Bell murder indictment from "on or between May 21, 1996 and May 23, 1996" to "on or about May 21, 1996." The court then instructed the jury using the amended timeframe. Profit claims that the amendment was an "impermissible response to defense tactics" made after the defense had closed its case.

■■■ We review amendments at trial of an indictment for an abuse of discretion and will only reverse such decisions upon a showing of prejudicial error. *See State v. Ostrem*, 535 N.W.2d 916, 922 (Minn.1995). A district court may permit an indictment to be amended "at any time before verdict or finding if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced." Minn. R.Crim. P. 17.05. "[I]n order to prejudice the substantial rights of the defendant, it must be shown that the amendment either added or charged a different offense." *Gerdes v. State*, 319 N.W.2d 710, 712 (Minn.1982).

In *Gerdes,* we addressed a question similar to the one presented here. In *Gerdes,* the state moved to amend the date of the alleged offense after the defendant's testimony showed that he could not have committed the charged crime on the date set forth in the original complaint. *Id.* at 711–12. We recognized that "where the date is not the essential element of the crime the trial court may properly allow an amendment of the complaint so that it comports with the evidence presented at trial." *Id.* at 712. Accordingly, we held that the district court did not abuse its discretion in permitting the complaint to be amended. *Id.*

Contrary to Profit's claims, the amendment to the Bell indictment did not represent a fundamental shift in the prosecution's theory. As early as its opening arguments, the state conceded that "it's somewhat difficult to determine exactly when [Bell] died" and that the murder could have occurred "within one day to one week before her body [was] recovered." Dr. Morey, a state's witness, said Bell could have been killed up to a week before her body was discovered on May 23. Bell's mother testified that she last spoke to Bell on May 18, 1996. Because the amended date on the Bell indictment is consistent with the case the state presented throughout the course of the trial, we conclude that Profit suffered no prejudice from amending the indictment after the close of testimony.

### IV.

Profit challenges the sufficiency of the state's circumstantial evidence to support the jury's verdict finding him guilty of Bell's murder. Profit was found guilty of two counts of first-degree murder under Minn. Stat. § 609.185(1) and (2) (1998) and one count of intentional second-degree murder under Minn.Stat. § 609.19, subd. 1(1) (1998). Section 609.185(1) requires the state to prove that the defendant killed a human being with premeditation and intent. Section 609.185(2) requires the state to prove that the defendant killed a human being "while committing or attempting to commit criminal sexual conduct in the first or second degree with force or violence." Section 609.19, subd. 1 requires a showing that the defendant "cause[d] the

death of a human being with intent * * * but without premeditation."

"While a conviction based only on circumstantial evidence warrants stricter scrutiny, such 'evidence is entitled to the same weight as any evidence so long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of guilt.'" *State v. Ashby,* 567 N.W.2d 21, 27 (Minn.1997) (quoting *State v. Bias,* 419 N.W.2d 480, 484 (Minn.1988)) (additional citations omitted). In analyzing a challenge to the sufficiency of the state's evidence, we review the record "to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *State v. Webb,* 440 N.W.2d 426, 430 (Minn.1989). In so doing, we must "recognize that the jury is in the best position to evaluate the credibility of witnesses" and assume that, after due consideration, the jurors believed the state's witnesses. *See Ashby,* 567 N.W.2d at 27; *State v. Moore,* 438 N.W.2d 101, 108 (Minn.1989).

In the present case, the state offered the testimony of Dr. Morey who concluded that Bell's death was a homicide. The evidence linking Profit to that crime included the following: Profit's wallet was found within several feet of where Bell's body had been discovered; Profit drove the Grand Am in which police discovered threads and fibers that experts concluded were indistinguishable from threads and fibers found on the ligature used to strangle Bell; and Profit told investigators that he "always" drove the Grand Am because it was the "only car he was insured under." A natural inference from this evidence is that Profit killed Bell.

This inference is buttressed by the state's *Spreigl* evidence and the state's evidence of the Johnson assault, which the district court found was sufficiently similar to the Bell murder to indicate a common plan. The *Spreigl* evidence showed Profit's pattern of abducting women, removing their clothes, tying them up with their clothes, and then raping them. Johnson, an African–American prostitute from the Broadway Avenue area of Minneapolis was picked up in that area and

induced to smoke crack cocaine, taken to Theodore Wirth Park, assaulted, and left nude. The state's evidence suggested that Bell, an African–American woman, was a prostitute who worked in the Broadway Avenue area of Minneapolis; that she used cocaine within a few hours before her death; that her nude body was found in Theodore Wirth Park; and that a ligature resembling the waistband from an article of clothing had been tied around her head and neck. From these similarities, the jury could reasonably infer that if Profit committed the *Spreigl* and Johnson crimes, he also killed Bell.

 To support the verdicts, however, the state also had to show that Profit killed Bell intentionally, with premeditation, and while committing or attempting sexual assault. "[T]he jury may infer that a person intends the natural and probable consequences of his actions." *State v. Cooper,* 561 N.W.2d 175, 179 (Minn.1997). A jury may also infer the defendant's intent to kill from the nature of the killing. *Id.*

 Premeditation may also be inferred from the nature of the crime. *State v. Moore,* 481 N.W.2d 355, 361 (Minn.1992). To support a verdict of premeditated murder, however, the state's evidence must show that the defendant considered, planned or prepared for, or determined to commit, the act prior to its commission. Minn.Stat. § 609.18 (1998). "A finding of premeditation does not require proof of extensive planning or preparation to kill, nor does it require any specific period of time for deliberation." *Cooper,* 561 N.W.2d at 180. Rather, "[t]he requisite plan to commit first degree murder can be formulated virtually instantaneously." *State v. Pilcher,* 472 N.W.2d 327, 335 (Minn.1991).

In the present case, the manner of the killing sufficiently supports findings of both intent and premeditation. Dr. Morey testified that the ligature used to strangle Bell was "wrapped tightly around [Bell's] neck once and secured behind her neck * * * with a knot," and that one end of the ligature "went across [Bell's] mouth and * * * underneath her tongue within her mouth." Dr. Morey also testified that the loop around Bell's neck was approximately five inches shorter than the circumference of her neck,

left a one-half inch deep furrow in her neck, and was secured so tightly that he had difficulty inserting his fingers between it and her neck.

 While the strangulation alone does not support an inference of premeditation, such an inference may be supported by the circumstances surrounding the strangulation. *See Pilcher,* 472 N.W.2d at 335. The natural consequences of tying an elaborate noose around a person's neck and tightening it to such extremes would be the death of that person. The intricate manner in which the ligature was looped and tied indicates that some appreciable time must have passed between the beginning of the strangulation and the end. The tightness of the ligature and the fact that it was knotted in that position suggest that the assailant was determined to kill Bell. In addition, according to state witnesses, Profit had said he would go to extreme measures to destroy evidence of his rapes. Such evidence reasonably supports findings of intent and premeditation.

 Although it presents a closer question, we also conclude that the evidence was sufficient for the jury to convict Profit of killing Bell while engaged in or attempting to commit criminal sexual conduct. Profit asserts that, because there were no injuries to Bell's vagina or any place other than her neck, and because no semen was found, there was insufficient evidence of criminal sexual conduct. Profit alleges that even if the jury could reasonably have inferred that Bell had sex prior to her death, the state presented no evidence that the sex was not consensual.

For the jury to find a defendant guilty under Minn.Stat. § 609.185(2), the state must show the defendant killed the victim while committing or attempting sexual penetration or sexual contact by force or violence. *See* Minn.Stat. § 609.343 (1998) (defining second-degree criminal sexual conduct). Like premeditation and intent, the existence of such sexual conduct can be inferred from the manner of the crime. *See Pilcher,* 472 N.W.2d at 336 (holding that evidence of "the position of the body, dirt and debris found in the buttocks and pubic area, the blood stained undergarments, the disheveled clothes, the

manual strangulation, and the bruising in the left breast area" was sufficient to support a conviction of murder under Minn.Stat. § 609.185(2)).

The inference that Bell had sexual contact prior to her death is reasonably supported by the fact that she was a reputed prostitute, was found naked, and had mud packed onto her vaginal area and upper torso. The fact that no seminal fluid or vaginal injuries were found is not dispositive, especially in light of Dr. Morey's testimony that the decomposition of Bell's body and the waters of Basset Creek could have destroyed such evidence. Furthermore, the testimony of two witnesses indicated that Profit knew the importance of not leaving physical evidence behind after a rape.

The conclusion that there was sexual contact and that it was forced rather than consensual is also supported by the state's *Spreigl* evidence. The evidence of Profit's prior crimes showed that his pattern was to abduct, strip, bind, and then rape his victims. The state showed many similarities between the Bell killing and Profit's prior rapes, including evidence that Bell was naked, had been bound with an article of clothing, and was from north Minneapolis. While the *Spreigl* crimes occurred 15 years prior to Profit's trial, Profit spent the vast majority of those 15 years in prison. The passage of time between the *Spreigl* and charged crimes has little effect on the relevance of the *Spreigl* crimes if, during that time, the defendant was in prison without any opportunity to commit subsequent crimes. *See State v. Scott*, 323 N.W.2d 790, 793 (Minn.1982). Furthermore, testimony indicated that even while confined Profit continued to plan and strategize rapes. Based on this evidence, we hold that the jury could reasonably conclude beyond a reasonable doubt that Profit killed Bell while committing or attempting to commit criminal sexual conduct.

Affirmed.

RUSSELL A. ANDERSON, Justice (concurring in part, dissenting in part).

I respectfully dissent from the court's decision affirming Profit's conviction for the murder of Renee Bell.

## I.

The murder of Renee Bell on or about May 21, 1996, was one of a series of murders that occurred during the summer of 1996 in or near Theodore Wirth Park in Minneapolis. It is readily apparent from the record before us that during its investigation of the killings in or near Theodore Wirth Park, the state considered the murders to have been committed by one person. Law enforcement officials investigated these crimes as signature crimes, believing that they were dealing with a serial killer who also was attempting to destroy evidence of sexual assault. The state created a task force to investigate the killings and relied upon the serial nature of the crimes when seeking search warrants. One police affidavit described the crime scenes in the Keoourdorn Phothisane murder and an earlier murder as "almost identical." In its presentation of evidence to the grand jury, the state referred to the suspect as a "serial killer." All of the victims were alleged to be prostitutes and their bodies were either burned, or in the case of Bell, packed with mud, arguably to hide evidence of sexual assault. Police considered Profit to be a suspect in these serial killings.

The only direct evidence that Profit murdered Bell consisted of (1) fibers found in the trunk of Profit's car which were similar to fibers in the ligature used to strangle Bell, and (2) the discovery of Profit's wallet more than 50 days after Bell's murder in an area close to where Bell's body was found. At trial, Profit and members of his family testified that Paul Kelly had access to and drove Profit's car around the time of Bell's killing. Testimony also was presented that Profit always kept his wallet in his automobile. In his closing argument, Profit's defense counsel argued that the evidence pointed to Paul Kelly's involvement in the murder of Bell.

Before trial, the state moved to exclude evidence of the other serial killings from Profit's trial and also moved to preclude all testimony from Kelly. The trial court granted the motion except as to Kelly, ruling that Kelly could testify regarding the Bell murder and the Johnson assault, but not as to unre-

lated, uncharged offenses. This ruling prevented Profit from calling Kelly to testify about a letter that Kelly wrote to KARE 11 TV in which he confessed that he killed, broke the neck of, and burned, one of the serial victims, Phothisane, a male transvestite. Phothisane's body was found on July 20, 1996, 1½ blocks away from where Bell's body was found.

The issue, then, is whether the trial court abused its discretion by ruling that Profit could not call Kelly to testify concerning his confession to the Phothisane murder, and, if error occurred, whether it was prejudicial.

Trial court decisions concerning the admissibility of evidence are reviewed for abuse of discretion. *See State v. Gustafson*, 379 N.W.2d 81, 84 (Minn.1985). Constitutional errors are reversible unless they are found harmless beyond a reasonable doubt. *See State v. Fossen*, 282 N.W.2d 496, 511 n. 12 (Minn.1979) (citing *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). An error is prejudicial if there is " 'reasonable possibility that the [error] complained of might have contributed to the conviction.' " *Chapman*, 386 U.S. at 23, 87 S.Ct. 824 (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963)).

Our Minnesota and United States Constitutions are protectors of the basic right to present a defense in a criminal trial. *See* U.S. Const. amend. XIV; Minn. Const. art. I, § 7. A defendant's right to present a defense includes providing a forum for the defendant to develop his or her own version of the facts. *See Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). "The right to offer the testimony of witnesses * * * is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the

prosecution's to the jury so it may decide where the truth lies." *State v. Richards*, 495 N.W.2d 187, 194 (Minn.1992) (quoting *Washington*, 388 U.S. at 19, 87 S.Ct. 1920). Trial courts must allow defendants to present favorable evidence which is material to their cases. *See United States v. Valenzuela–Bernal*, 458 U.S. 858, 867–68, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982).

We have made clear that when evidence of other crimes is relied upon by the state to prove identity, the defendant is also entitled to introduce similar other crime evidence to cast doubt upon the state's identification of the defendant as the individual who committed the charged crime. *State v. Bock*, 229 Minn. 449, 458, 39 N.W.2d 887, 892 (1949). In *Bock*, we stated:

Where the state has introduced evidence of other crimes to establish identity, the defendant is entitled to rebut the inference that might be drawn therefrom by showing that the crimes have been committed by someone else. *He should also have the right to show that crimes of a similar nature have been committed by some other person when the acts of such other person are so closely connected in point of time and method of operation as to cast doubt upon the identification of defendant as the person who committed the crime charged against him.*

*Id.* (emphasis added) (internal citations omitted).

Kelly's written confession that he killed Phothisane is "other crimes" evidence and its admissibility is all the more compelling because the state relies upon an "other crimes" analysis to justify joinder of the Bell and Johnson cases.[1] Profit, accused of a murder that is part of a serial pattern, should have been allowed to present to the jury evidence that Kelly confessed in writing[2] to killing a

---

1. For purposes of this dissent, I accept the court's analysis that evidence of the Bell murder and evidence of the Johnson assault would have been otherwise admissible to prove identity and modus operandi under an "other crimes" analysis had these cases been tried separately. However, I question whether evidence of the Bell murder would have been admissible as *Spreigl* evidence in the Johnson assault case, given the overwhelming evidence of Profit's identity in the Johnson case.

2. While the court would like to characterize Kelly's participation in the investigation as cooperative so as to imply his innocence, it is not disputed that Kelly only told investigators that he authored the KARE 11 confession after a state handwriting expert identified the handwriting as Kelly's.

victim under nearly identical circumstances a few weeks later, 1½ blocks away from the site where the victim in the charged crime was found. That such evidence should have been admitted is particularly compelling when, as here, there is evidence circumstantially linking Kelly to the Bell murder; namely, that Kelly drove Profit's car and had access to Profit's wallet.

Furthermore, the court's analysis allows the Bell murder and the Johnson assault to be considered signature crimes for purposes of analyzing the impact of improper joinder but does not allow Profit the opportunity to present as part of his defense the serial nature of the Bell and Phothisane killings. This analysis is troubling, particularly when the crime confessed to by Kelly, the killing of Phothisane, has more similarities to the Bell murder than does the Johnson assault.

The court's opinion does not dispute that the trial court's ruling on the state's motion to exclude the testimony of Kelly prevented Profit from calling Kelly to testify concerning Kelly's handwritten confession in which he admitted that he killed Phothisane. The court concludes, however, that the handwritten confession of Kelly is inadmissible because it is hearsay. I agree that without Kelly's testimony, the confession is hearsay, but it is made inadmissible hearsay only by the trial court's ruling, affirmed by the court, which denied Profit the right to call Kelly to testify concerning the confession.[3]

In my opinion, the trial court committed prejudicial error when it ruled, in response to a pretrial motion of the state, that Profit could not present "other crimes" evidence regarding the KARE 11 confession and Kelly's involvement in the murder of Phothisane. The trial court should have allowed Profit to present the testimony of Kelly to the jury

and should have allowed the jury to determine the truth of the matter.[4] The trial court's ruling, now affirmed by the court, denied Profit his constitutional right to present a defense. On review, there is a reasonable possibility that the trial court's error might have contributed to the conviction of Profit for the murder of Bell. Therefore, I would remand the Bell case to the district court for a new trial.

I would affirm Profit's conviction for the assault against Johnson based upon the overwhelming direct evidence of guilt presented at trial. The error that I write of is not prejudicial as to Profit's conviction for assault against Johnson because there is no reasonable possibility that the error contributed to Profit's assault conviction.

## II.

The manner in which the jury was instructed with regard to the joined cases is also troubling. If the trials had been severed but evidence of the other crime had been admitted as *Spreigl* evidence, the jury would have been cautioned against using one alleged crime to convict Profit of the other. *See 10 Minn. Dist. Judges Ass'n, Minnesota Practice*, CRIMJIG 2.01 and 3.16 (3d ed.1990).

Here, no such cautionary instruction was given regarding the Bell and Johnson charges, even though the trial court did instruct the jury that "other crimes" evidence from acts committed in 1981 had been admitted for the limited purpose of assisting the jury in determining if Profit committed the crimes charged. The jurors were instructed that they could not convict Profit on the basis of "other crimes" that occurred in 1981.

In *State v. Knight*, we rejected a defendant's argument that joinder was prejudicial

---

3. The court rejects the KARE 11 confession on grounds that it lacks "indicia of trustworthiness." On its face, it seems apparent that a handwritten confession, by itself, is sufficient to allow the evidence to be presented to a jury. The trial court made no findings regarding the trustworthiness of the confession.

4. The court points to the circumstantial evidence linking Profit, not Kelly, to the serial killings, writing: "If the record contained additional or different evidence implicating Kelly as Phothi-

sane's killer, our conclusion concerning the district court's exclusion of the KARE letter might well be different." The trial court's ruling on the state's motion in limine made no findings and contained little analysis regarding Profit's attempt to introduce the KARE 11 confession and other evidence of Kelly's involvement in the Theodore Wirth Park killings. Instead, the trial court rejected the evidence that Profit sought to introduce on grounds that it was not relevant.

based upon—at least in part—the fact that the trial court separated the issues and instructed the jury to treat the two offenses separately. 260 N.W.2d 186, 187 (Minn. 1977). Similar instructions should have been given here. Instead, the instructions given by the trial court did not direct the jury to treat the Bell and Johnson cases separately. This error is compounded by the fact that the trial court instructed the jury on how to regard the 1981 "other crimes" evidence, but left the jury to speculate as to how the evidence of the Bell murder related to the evidence of the Johnson assault, and how evidence of the Johnson assault related to the evidence of the Bell murder. This jury could have deliberated with the understanding that the strong evidence of guilt in the Johnson case could be used as evidence that Profit committed the Bell murder even though the evidence of identity in the Bell case was circumstantial and weak.[5] Minnesota's jury instruction guidelines does not contain a cautionary instruction when crimes have been joined for trial, but I would urge trial judges to give a jury instruction patterned after the federal jury instruction when charges are joined.[6]

PAGE, Justice (dissenting and concurring).

I join in the dissent and concurrence of Justice Russell A. Anderson.

STRINGER, Justice (dissenting and concurring).

I join in the dissent and concurrence of Justice Russell A. Anderson.

---

5. The court concludes that "[w]hen a defendant is charged with and may permissibly be convicted of both crimes, there is less danger that the jury will try to punish the defendant for one crime by convicting him of the other." The court cites no precedent for this statement. If there is danger that "other crimes" evidence will prejudice a jury so that we require trial courts to instruct jurors on how to view this evidence, it seems logical to require similar safeguards when the offenses are joined.

6. A sample federal jury instruction for a single defendant charged with multiple counts reads: "A separate crime is charged in each count of the indictment. Each charge, and the evidence pertaining to it, should be considered separately by the jury. The fact that you may find [the] defendant guilty or not guilty as to one of the offenses charged should not control your verdict as to any other offense charged." Edward J. Devitt, et al., 1 *Federal Jury Practice and Instructions*, § 12.12 (4th ed.1992). The model instruction used by the Eighth Circuit states: "Keep in mind that each count charges a separate crime. You must consider each count separately, and return a separate verdict for each count." Eighth Circuit Manual of Model Jury Instructions (Criminal), § 3.06 (1996).