STATE of Minnesota, Respondent,

v.

Jerrold O. CONAWAY, Appellant.

Nos. 51276, 51277 and 51552.

Supreme Court of Minnesota.

May 14, 1982.

Friedberg & Peterson and Mark W. Peterson, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Thomas L. Johnson, County Atty., Vernon E. Bergstrom, Chief, Appellate Section, Michael McGlennen, Thomas A. Weist and Anne E. Peek, Asst. County Attys., Minneapolis, for respondent.

YETKA, Justice.

This criminal appeal from Hennepin County District Court raises three issues: (1) the legality of defendant's arrest, (2) the sufficiency of the evidence to support defendant's conviction for possession of tools with intent to commit burglary, and (3) the propriety of joinder for trial of two of the three offenses with which defendant was charged. Defendant was originally charged in two separate complaints: the first charged him with knowingly receiving or concealing stolen property; the second, with possessing tools with intent to commit burglary and using a so-called "red box" to make fraudulent long-distance telephone calls. The district court granted the state's motion for joinder of the stolen property charge with the possession of burglary tools charge, but ordered a separate trial for the fraudulent telephone calls charge. The court denied a motion to suppress, which, had it been granted, would have required the dismissal of all charges against defendant. At the first trial, on the joined charges, defendant was found guilty of the burglary tools charge and guilty of the less serious misdemeanor offense of receiving stolen property. A subsequent trial on stipulated facts resulted in the defendant being convicted of the phone calls charge. This appeal involves only the joined charges. We affirm the conviction.

Defendant is a 54-year-old Bloomington resident who has spent approximately a fifth of his life in jail and who, by his own admission, has been a professional thief most of his adult life.

On August 10, 1979, defendant was having his van repaired at Downtown Chevytown. When it became apparent that the repairs would not be completed that day, Herbert Borreson, the used car manager, who knew defendant as a customer, allowed defendant to take one of the dealership's used cars as a loaner. The loaner was a 1976 maroon-over-white Chevrolet Monte Carlo bearing license plate number ACD 362. Several months earlier, in May, a 1976 black-over-silver Chevrolet had been stolen from the lot. In reporting that car as stolen, Borreson apparently got the inventory index cards for this car and the maroon-over-white car mixed up. He gave police the correct color of the stolen car (black over silver) but the license plate number and vehicle identification number of the maroon-over-white car. Thus, on August 10, when defendant took the loaner home for the weekend, he took home a car which had never been stolen, but which had been listed on police department records and on the state computer as stolen.

On August 13, 1979, Special Agent Robert Bonshire of the FBI, who knew defendant from prior investigations and was acquainted with defendant's record, received a call from a neighbor of the defendant. The neighbor informed him that defendant was now driving a different car. After checking the state computer, which listed the car as stolen, Bonshire contacted Bloomington police.

Bloomington Police Officer James Johnson checked with the state computer and obtained the same information. Reserve officers, acting under Johnson's orders, then checked and learned that the originating agency was the Minneapolis Police Department.

Surveillance of defendant's house was established at 6:00 p.m. on August 13. Minutes later, defendant came out, entered the car, and took an unusual, indirect route to a Perkins Restaurant. Before leaving the restaurant, defendant made at least one telephone call.

After leaving, defendant took a direct route home. Officers Bonshire, Johnson and McComb continued their surveillance and commented that it was unlikely that defendant, an experienced career criminal who knew that at any time the

police might be investigating him, would park a known stolen vehicle in his driveway in open view. The officers decided that it was possible that the defendant needed the car available at a moment's notice.

While waiting, the officers made a number of calls concerning the car. Johnson contacted the Minneapolis police, who told him that the car was listed as stolen but that the report listed the car as being black over silver. The officers decided, however, that the report was either incorrect about the car's color or that the car had been repainted. Johnson next contacted a representative of Downtown Chevytown. The representative said he did not believe Downtown Chevytown had any cars listed as stolen at that time and that it was possible the car had been sold to AAA Leasing. Johnson contacted a representative of AAA Leasing, who said that, to the best of his knowledge, AAA had no car similar to the alleged stolen car. Johnson then made a follow-up call to the Minneapolis Police Department and was told that Herbert Borreson or Benneson had filed a report. The officers made a number of attempts to contact him, but were unsuccessful.

At this point, the officers decided to attempt to connect the defendant to the car. In order to do this, the officers planned to contact a marked squad car and have it stop the car as soon as defendant left and to arrest the defendant as he was driving the car.

Shortly after 10:00 p.m., defendant came out, opened the trunk two times, got in the car and left. The officers did not contact the marked squad car, but instead decided to follow defendant. Instead of taking a quick route to downtown Minneapolis, defendant took a slower route using city streets. Once downtown, defendant parked his car and entered Murray's Restaurant.

McComb then contacted Minneapolis police and asked them to make the arrest when defendant came out and re-entered the car. Defendant was stopped around 11:30 p.m. on Second Avenue between Sixth and Seventh Streets.

When he was arrested and told that the car was stolen, defendant responded that the car was a loaner from Downtown Chevytown and that the problem could be straightened out quickly if the police would call Herbert Borreson or Downtown Chevytown. The apparent response of the Minneapolis officer was that it did not matter, that they were arresting him at the request of Bloomington police and that the car was listed as stolen.

An immediate on-the-scene inventory search of the trunk resulted in the discovery and seizure of three plastic garbage bags containing approximately 120 items of clothing, many on hangers with double tags attached, about half of which were later specifically identified as having been stolen (presumably shoplifted) from nine different Twin Cities area stores. The clothes that were specifically identified as having been stolen were valued at approximately $4,500. Police also found a number of gems in a black case in the trunk, as well as gems in an ankle wallet on defendant's person. These gems, which had a retail value of approximately $25,000, were offered into evidence only to connect defendant to the items in the trunk; the state stipulated that defendant had obtained the gems from retail outlets in the normal course of business. Defendant also had $1,000 in traveler's checks on his person.

A warranted search of defendant's house for more stolen property at 6:00 a.m. the following morning failed to turn up any stolen property, but resulted in the discovery of a large number of burglary tools in an old wellroom in the basement and a couple of lock picks upstairs in the living quarters. Items seized from the basement included books showing radio frequencies for various police departments around the country; books containing lock codes; communications equipment, including crystals for frequencies used by certain local police departments; sets of both blank and cut keys; tools a burglar could use; numerous lock picks; a burglar alarm bypass device; and a bulletproof vest. Although many of the items found were a number of years old, the state was able to show that one of

the drills was only 2 years old, at the most, and another drill less than 6 months old. The "red boxes" used in the separate prosecution of defendant for telephone fraud were also discovered in the house. Police also took a photograph of defendant's bookshelf, which contained, among other books, a number of books on subjects of interest to the professional criminal.

The district court granted the motion to join two of the offenses for trial because it concluded that the possessory aspects of each of the two offenses occurred at the same time, although in different locations, and that the evidence of each would be admissible *Spreigl* evidence in the trial of the other. The court refused to join the fraudulent telephone charge with the others.

On the basis of stipulated evidence, the court denied the suppression motion at the omnibus hearing, stating that probable cause was not defeated because the evidence that indicated to the officers that the car was stolen "preponderated over the evidence to the contrary."

Defendant took the stand in his own behalf and admitted that, until a couple of years ago, he had been a professional thief, but claimed that he had "mellowed" because of his wife. He claimed that the tools, many of which he admitted were burglary tools, had been in the basement for years and that he had not had any present intent of using them in committing any burglary. He claimed he first saw the stolen clothing when he opened the trunk earlier in the day on the 13th; he had assumed the clothing was stolen, but denied knowing it was. He testified that he tried to call Borreson about the clothing.

The jury found that defendant only believed, rather than knew, the clothing was stolen; but, on the other hand, concluded that defendant possessed the tools with intent to use them to commit burglary. The court, in denying a motion for a new trial, stated that the jury gave defendant the benefit of every possible doubt in finding him guilty only of misdemeanor receiving or concealing. The court added that it took the arguable weakness of the evidence—for example, the age of the tools—into account in imposing sentence for the burglary tools charge.

1. Defendant's contention that the arrest was illegal is a two-part contention. First, he contends that the arrest was not based on probable cause because the police were not entitled to rely on the inaccurate stolen property report. Second, he argues that his arrest was an illegal pretext arrest made solely to make possible a search of the trunk and of defendant's person.

■ Several points should be noted initially. First, a defendant's "arrest is not justified by what the subsequent search discloses." *Henry v. United States*, 361 U.S. 98, 103, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959). Second, as both parties admit, if the police did not have probable cause to arrest defendant for the stolen vehicle offense, then everything else falls and the subsequent search was improper. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

■ Addressing the issue of probable cause, under *Whiteley v. Warden*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971), police, in a limited sense, are entitled to act upon the strength of a directive or request from other police officers or other police departments to make an arrest. This means that "the arresting officer is himself not at fault and thus should not be held personally responsible in a civil action for disciplinary proceeding if it turns out that there was no probable cause at the source." 1 W. LaFave, *Search and Seizure*, § 3.5(b) (1978). However, in the context of a suppression motion, the question is "whether the law enforcement system as a whole has complied with the requirements of the Fourth Amendment, which means that the evidence should be excluded if facts adding up to probable cause were not in the hands of the officer or agency which gave the order or made the request." *Id.*

There are several ways to review the probable cause determination of an arresting officer who has not personally acquired

the factual data from which to establish probable cause, but instead has learned of these facts from police communications. The first of these can be referred to as the "collective knowledge" approach; the second approach focuses on the reasonableness of the arresting officer's belief in the information supplied by the police communication. This court adopted the collective approach in *State v. Radil*, 288 Minn. 279, 283, 179 N.W.2d 602, 605 (1970), *cert. denied*, 401 U.S. 921, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971):

> In a metropolitan environment, with many police and fast-moving criminal activities, it is unrealistic to demand that each officer in the department personally know all the facts necessary to justify an arrest. The right to act must be judged by the total knowledge of the police department.

■ Under the "collective knowledge" approach, the *entire* knowledge of the police force is pooled and imputed to the arresting officer for the purpose of determining if sufficient probable cause exists for an arrest. Should, however, the police network fail to have sufficient collective information to establish probable cause (*e.g.*, the initial arrest warrant is defective), then the arrest is illegal. *Whiteley v. Warden*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); *State v. Ramsey County District Court*, 276 Minn. 324, 150 N.W.2d 18 (1967). This "collective knowledge" approach has also been followed in Wisconsin. *Schaffer v. State*, 75 Wis.2d 673, 250 N.W.2d 326 (1977); *State v. Taylor*, 60 Wis.2d 506, 210 N.W.2d 873 (1973).

■ The "collective knowledge" approach does not hamper a police force in the completion of its law enforcement duties. *State v. Radil*, 280 Minn. 279, 179 N.W.2d 602 (1970), *cert. denied*, 401 U.S. 921, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971). Police officers are entitled to act on the strength of information received from the department and may assume at the time of apprehension that probable cause exists. *Whiteley v. Warden*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); *Schaffer v. State*, 75 Wis.2d 673, 250 N.W.2d 326 (1977). The Wisconsin court summarized this rule well in *Schaffer* when it said:

> An arresting officer may rely on all collective information in the police department, and, acting in good faith on the basis of such information, may assume at the time of apprehension that probable cause has been established. Thus, an officer, such as Vande Berge here, who in good faith relies upon such collective information, is legally justified to make an arrest.
>
> Such legal justification, however, cannot alone constitute probable cause for such an arrest, for it is necessary that the officer's underlying assumption of probable cause be correct.

75 Wis.2d at 676–77, 250 N.W.2d 326 at 329 (citations omitted).

■ The "collective knowledge" approach does not mean that every time erroneous information is communicated to an officer, a resulting arrest is invalid. When information is reported to an officer which alone would not sustain a finding of probable cause but leads the officer to gather additional information, this newly gathered information can be used to sustain a finding of probable cause if it is *corroborative* of the initially reported information. *See Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Moreover, because the facts relied upon turn out to be untrue after the fact does not destroy probable cause. The operative question is whether the police—as a collective body—have knowledge of information that belies probable cause at the time of the arrest. *See* 1 W. LaFave, *Search and Seizure* § 3.5(d) (1978).

A review of the evidence on this point is helpful here. It is clear that the license number and VIN (serial number) given of the stolen automobile were those of the 1976 Monte Carlo white with burgundy top found in defendant's possession and that such car had not been stolen. It is also clear that the 1976 Monte Carlo silver with black top which had been stolen was recovered minus its license plates about one week

later. There is no information in the transcript indicating how the police identified that car since only the car's color fit the stolen vehicle report information. At any rate, it seems that neither any individual policeman nor the police department as a whole had any basis for determining that the stolen car had been recovered.

Furthermore, witness McComb testified: The colors were somewhat similar in that it was a dark top and a lighter bottom. Awmm, the fact that it was also from a—a car dealership could have been a mistake in our minds; and we had, aw, in previous experience—or, from previous experience quite often the color that is listed is not always the color, the actual color of the vehicle.

According to a statement of the prosecutor, the property that was in the car was inventoried at the scene of the arrest and the car was then towed to a storage service pursuant to standard procedure.

 The purpose of the exclusionary rule is to deter unconscionable invasions of privacy by law enforcement officials in pursuit of their duties. See Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Far from being culpable, the actions of the police department do not even appear to have been negligent. The police had received a report of a stolen vehicle bearing the license number of the car driven by appellant; Borreson had given the wrong license number. That was not the fault of the police, and the police had no reason to question the information. The police records, at the time of the arrest, contained the information that the car driven by appellant was stolen. Thus, there was no information held by the police department that the car thought to be stolen in fact was not. In that context, the police had sufficient collective knowledge to establish probable cause for the arrest.

 In addition, the police were aware of the defendant's circuitous route with his car on one of the two trips he took that day from his home; of the telephone call the defendant made from Perkins Restaurant; of the opening of the car trunk in the late evening by defendant; and of defendant's long criminal record. Therefore, the arresting officers had independent corroborative information to establish probable cause. See Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Nor does the color discrepancy, in view of both the officers' explanation and the fact that the license number matched, make the officers' actions unreasonable. This does not appear to be sufficient information to place the officers on notice that the police reports upon which they relied were false.

In light of this evidence, we concur with the trial court's findings that the police acted with probable cause for stopping and arresting the defendant and searching his car.

2. We next address the sufficiency of the evidence on the possession of burglary tools charge.

 Intent to use burglary tools may be drawn from the character of the objects and from the circumstances surrounding their possession. There is no absolute requirement that the state link the defendant to any past or future burglary. State v. Valstad, 282 Minn. 301, 165 N.W.2d 19 (1969). The intent necessary is a general intent to use the tools in the commission of a burglary and not an intent to commit a particular burglary. Id.

The cases we have had in the past have been relatively easy cases where the tools were found in the defendant's car or on his person when he was arrested and there was evidence that he was about to commit a burglary. State v. Valstad, 282 Minn. 301, 165 N.W.2d 19 (1969); State v. Emerson, 284 Minn. 540, 169 N.W.2d 63 (1969), cert. denied, 397 U.S. 946, 90 S.Ct. 967, 25 L.Ed.2d 129 (1970).

In this case, the tools were found in the house and the ones which were clearly burglary tools were older tools. It is therefore possible that defendant was telling the truth when he said it had been years since he committed a burglary and that he had no intent on May 13 to use the tools to commit burglaries. On the other hand, the fact

that he was driving a car with a trunk full of stolen property, albeit property taken by shoplifting rather than in a burglary, casts doubt on defendant's testimony that he had reformed. Similarly, the fact that a couple of lock picks were found upstairs in the living quarters also suggests that the tools in the basement were not being kept just as mementos of his career as a burglar.

The standard in a case in which burglary tools are found in a defendant's house is as stated in *Commonwealth v. Dionisio*, 178 Pa.Super. 330, 116 A.2d 109 (1955). There, the defendant, who was convicted of possession of burglary tools found in his house, contended that one could be convicted of possession of burglary tools only if the possession was at or near the scene of an attempted burglary. In rejecting this contention and upholding the defendant's conviction, the court stated that, when possession of such tools in a house stands alone and is as compatible with innocence as guilt, a conviction may not stand. When, however, possession of tools peculiarly suited to burglary is coupled with strong circumstantial evidence manifesting criminal intent, a conviction may be supported. We agree that the evidence is sufficient.

3. Defendant's final contention is that the trial court erred in allowing joinder of the stolen property and burglary tools charges for trial.

Minn.R.Crim.P. 17.03, subd. 1, provides for limited joinder of offenses, specifically providing that "When the defendant's conduct constitutes more than one offense, each such offense may be charged in the same indictment or complaint in a separate count." [1] The comments to this rule state

that it adopts the provisions of Minn.Stat. § 609.035 (1980) as to when offenses arise from a single course of conduct, and this court has agreed. *State v. White*, 292 N.W.2d 16 (Minn.1980).

While, as a matter of policy, joinder made sense in this case, it is stretching things to say that the two offenses were part of a single course of conduct. Although joinder may have been technically improper under the rule, it was not, however, prejudicial. The evidence of each offense would have been admissible *Spreigl* evidence in the trial of the other, and the trial court so held. *See State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965). The evidence of the possession of burglary tools would have been admissible in the stolen goods trial to prove that defendant knew the clothes in the trunk were stolen. The evidence of the possession of the stolen property would have been admissible in the burglary tools trial to show intent. Thus, there was no prejudicial error in joinder.

The trial court is affirmed.

KELLEY, J., took no part in the consideration or decision of this case.

---

1. We say "limited joinder" because Fed.R. Crim.P. 8(a) is considerably more liberal in that it also permits joinder of offenses of the same or similar character even if not part of a single behavioral incident or course of conduct, and appellate reversal of the federal trial court's decision not to grant severance is rare. *See* Decker, *Joinder and Severance in Federal Criminal Cases: An Examination of Judicial Interpretation of The Federal Rules*, 53 Notre Dame L.Rev. 147 (1977). Section 1.1 of ABA Standards, *Joinder and Severance*, has a joinder provision similar to the federal one, but § 2.2 gives the defendant a right to severance if the offenses joined were not part of a single course of conduct and provides for liberal severance if the offenses joined were part of a single course of conduct. ABA Standards, *Joinder and Severance*, §§ 1.1, 2.2 (1968).