*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1232**

State of Minnesota,
Appellant,

vs.

Brittney Dominique McKinney,
Respondent.

**Filed December 22, 2014
Reversed and remanded
Schellhas, Judge**

Hennepin County District Court
File No. 27-CR-13-13209

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Lee W. Barry, Assistant County Attorney, Minneapolis, Minnesota (for appellant)

Matthew J. Mankey, Golden Valley, Minnesota (for respondent)

Considered and decided by Ross, Presiding Judge; Cleary, Chief Judge; and Schellhas, Judge.

**U N P U B L I S H E D   O P I N I O N**

**SCHELLHAS**, Judge

In this pretrial appeal, appellant argues that the district court erred in concluding that the stop of a vehicle in which respondent was a passenger was not justified by

reasonable articulable suspicion of violation of law. We reverse and remand for further proceedings.

## FACTS

While on duty during an evening in April 2013, Minneapolis Police Officers Cory Taylor, as passenger, and Bridget Reilly, as driver, were in a fully marked squad car. The officers were following a vehicle in which respondent Brittney Dominique McKinney was a passenger. Officer Taylor testified that he did not know why the officers were following the vehicle but, after "a couple" of blocks, "the vehicle failed to make a complete stop at a stop sign." Officer Taylor did not see any furtive behavior of the vehicle's occupants or any other indication of criminal activity other than the traffic violation. The record is silent about Officer Reilly's observations.

The officers stopped the vehicle for the traffic violation and learned that neither the driver nor McKinney had a valid driver's license and that the vehicle was not insured. Officer Taylor cited the driver for driver's license and vehicle-insurance violations, and Officer Reilly called for a tow truck and informed the driver that the vehicle would be towed and impounded. Officer Taylor told McKinney that the vehicle would be towed and instructed her to exit the vehicle. As McKinney exited the vehicle, Officer Taylor, who was standing about three feet from McKinney, "noticed what looked like a plastic baggie drop from her right hand to the ground." As McKinney walked toward the front of the vehicle, Officer Taylor observed that the baggie contained what "looked like marble-sized white things inside of it inside of another plastic baggie." Based on his training and experience, Officer Taylor believed that the objects were "possibly narcotics, crack or

2

cocaine." Officer Taylor then grabbed McKinney by the left wrist, "escorted" her back to the baggie, and picked it up to "get a better look at it." McKinney tried to pull away from Officer Taylor, when he leaned down to pick up the baggie, and "said something along [the] lines of, 'you pinning the drugs on me.'" At the time that McKinney made the statement, Officer Taylor had not said anything about drugs.

Appellant State of Minnesota charged McKinney with one count of third-degree controlled-substance crime (felony possession) in violation of Minn. Stat. § 152.023, subd. 2(a)(l) (2012). Shortly thereafter, McKinney moved to suppress the evidence obtained as a result of the traffic stop. The district court conducted a *Rasmussen* hearing with Officer Taylor as the sole witness. Following the hearing, both parties submitted memoranda. The district court determined that the traffic stop was not justified at its inception and, on July 10, 2014, granted McKinney's suppression motion.

The state filed this pretrial appeal, challenging the district court's ruling.

## D E C I S I O N

"In order for an appellate court to review a pretrial order, the State must show that the district court's ruling will have a critical impact on its case." *State v. Obeta*, 796 N.W.2d 282, 286 (Minn. 2011). An order suppressing evidence will have such a critical impact "if the lack of the suppressed evidence significantly reduces the likelihood of a successful prosecution." *Id.* (quotation omitted). The state argues that the district court's suppression order critically impacts the prosecution of this case because McKinney is charged with third-degree controlled-substance possession of the drugs that she allegedly abandoned. McKinney concedes in her brief, and we independently conclude, that the

3

district court's order suppressing all evidence obtained as a result of the traffic stop will have a critical impact on the state's efforts to prosecute McKinney for third-degree controlled-substance crime.

"When reviewing a district court's pretrial order on a motion to suppress evidence, the district court's factual findings are reviewed under a clearly erroneous standard. But legal determinations, such as whether there was a seizure and, if so, whether that seizure was unreasonable, are reviewed de novo." *State v. Eichers*, 853 N.W.2d 114, 118 (Minn. 2014) (citation omitted).

Both the U.S. Constitution and the Minnesota Constitution guarantee "[t]he right of the people to be secure in their persons, houses, papers, and effects" against "unreasonable searches and seizures." U.S. Const. amend. IV; Minn. Const. art. I, § 10. "It is generally established that a seizure occurs when a police officer stops a vehicle." *State v. Klamar*, 823 N.W.2d 687, 692 (Minn. App. 2012) (citing *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S. Ct. 1391, 1396 (1979)). "In evaluating the reasonableness of a traffic stop, the subjective intent of the police officer is not a relevant consideration." *State v. Askerooth*, 681 N.W.2d 353, 374–75 (Minn. 2004); *see also State v. George*, 557 N.W.2d 575, 577 n.1 (Minn. 1997) (citing *Whren v. United States*, 517 U.S. 806, 116 S. Ct. 1769 (1996), and stating that "under a *Whren* analysis, any subjective desire by [the officer who made the traffic stop] to seek evidence of other illegal activity would not have invalidated the stop, had it been otherwise valid"). An officer may "conduct a limited investigatory stop of a motorist if the state can show that the officer had a particularized and objective basis for suspecting the particular person stopped of criminal

4

activity." *State v. Anderson*, 683 N.W.2d 818, 822–23 (Minn. 2004) (quotation omitted). "Generally, if an officer observes a violation of a traffic law, no matter how insignificant the traffic law, that observation forms the requisite particularized and objective basis for conducting a traffic stop." *Id*. at 823.

"The collective knowledge of the police may provide the basis for an investigatory stop. Under the doctrine of collective knowledge, the factual basis justifying the investigatory stop need not be known to the officer acting in the field." *Magnuson v. Comm'r of Pub. Safety*, 703 N.W.2d 557, 559–60 (Minn. App. 2005) (citation omitted). Rather, "the grounds for making the stop can be based on the collective knowledge of all investigating officers." *In re Welfare of G. (NMN) M.*, 542 N.W.2d 54, 57 (Minn. App. 1996), *aff'd on other grounds sub nom. In re Welfare of G.M.*, 560 N.W.2d 687 (Minn. 1997); *see also State v. Lemert*, 843 N.W.2d 227, 231 n.2 (Minn. 2014) (applying collective-knowledge doctrine on review of legality of pat search); *State v. Lemieux*, 726 N.W.2d 783, 789 (Minn. 2007) (applying collective-knowledge doctrine on review of legality of emergency-aid search of residence); *State v. Conaway*, 319 N.W.2d 35, 40 (Minn. 1982) (applying collective-knowledge doctrine on review of legality of arrest). The collective-knowledge doctrine allows the knowledge of one officer (source) to be imputed to another officer (actor) for purposes of determining whether the actor's search or seizure was justified, so long as the source and the actor were involved in the same investigation and communicating to "some degree." *See Lemieux*, 726 N.W.2d at 789.

In this case, only Officer Taylor testified at the *Rasmussen* hearing; his partner, Officer Reilly, did not appear. In relevant part, Officer Taylor testified on direct examination as follows:

> THE PROSECUTOR: And would you tell the Court, please, what led up to that [traffic] stop?
>
> OFFICER TAYLOR: We were driving, following a vehicle, the vehicle failed to make a complete stop at a stop sign. So then we initiated a traffic stop.
>
> THE PROSECUTOR: And if you could characterize how, any more detail about how it failed to stop?
>
> OFFICER TAYLOR: It was like a rolling stop where it slowed down at the stop sign but didn't come to a complete stop. And then when it got there, it ended up turning westbound.
>
> . . . .
>
> THE PROSECUTOR: How did you and your partner get the vehicle to stop?
>
> OFFICER TAYLOR: We turned on, activated the overhead lights, red and blue lights.
>
> THE PROSECUTOR: And did the vehicle stop?
>
> OFFICER TAYLOR: Yes.
>
> THE PROSECUTOR: How soon?
>
> OFFICER TAYLOR: As soon as we turned on our lights.

On cross-examination, Officer Taylor further testified:

> DEFFENSE COUNSEL: Why were you following [the vehicle]?
>
> OFFICER TAYLOR: I don't know. I wasn't driving.
>
> DEFENSE COUNSEL: Did your partner indicate to you why he [sic] was following it?
>
> OFFICER TAYLOR: No.
>
> DEFENSE COUNSEL: But your partner would know?
>
> OFFICER TAYLOR: That I don't know.
>
> DEFENSE COUNSEL: Would you agree, however, from your vantage point in the passenger seat, you did not see any other traffic violations?
>
> OFFICER TAYLOR: No.
>
> DEFENSE COUNSEL: You would not agree with that, or you would?

OFFICER TAYLOR: I would agree with that; sorry.

DEFENSE COUNSEL: Would you agree that you did not see any furtive behavior by either the driver or the passenger inside the motor vehicle?

OFFICER TAYLOR: That's correct.

DEFENSE COUNSEL: Would you agree that you had no other reasonable suspicion that it had been engaged in any criminal behavior?

OFFICER TAYLOR: That's correct.

DEFENSE COUNSEL: And you would categorize this as a rolling stop; is that right?

OFFICER TAYLOR: Yes.

DEFENSE COUNSEL: So it slowed down, but just didn't come to a complete stop?

OFFICER TAYLOR: Yes.

DEFENSE COUNSEL: And it actually turned right at that stop sign; isn't that right?

OFFICER TAYLOR: Yes.

In its suppression order, the district court found that "Officer Taylor testified that he saw the vehicle make a rolling stop, but could not confirm whether this was the reason for the vehicle's seizure." This finding is clearly erroneous in light of Officer Taylor's testimony that "the vehicle failed to make a complete stop at a stop sign. So then we initiated a traffic stop." *Cf. The American Heritage Dictionary of the English Language* at 1648 (4th ed. 2006) (defining "so" as "[b]ecause of the reason given; consequently"). Although Officer Taylor expressed uncertainty about why the officers were following the vehicle *prior to* the traffic stop, at no point during his testimony did he express uncertainty about or disclaim knowledge of the reason for the traffic stop.

The district court also found that "the record is void of the objective facts giving rise to the seizure of the vehicle." This finding also is clearly erroneous. Officer Taylor testified about the date and time of the traffic stop, the location of the stop, the reason for

7

the stop, and the manner in which the stop was made. He also testified about the officers' physical positions relative to the stopped vehicle and its occupants and the course of events during the stop. In its suppression order, the court did not question Officer Taylor's credibility, instead apparently discounting his testimony because "[t]he officer who pulled over the vehicle did not testify." Consistent with the court's evaluation of Officer Taylor's testimony, McKinney argues on appeal that although "Officer Taylor did testify that he saw the vehicle make a 'rolling stop[,]' . . . he is not the officer who made the seizure." But Officer Taylor testified that "*we* initiated a traffic stop" and that the stop was effectuated immediately after "[*w*]*e* turned on, activated the overhead lights, red and blue lights." (Emphasis added.) McKinney has offered no authority, and we have found none, ascribing constitutional significance to a police officer's role as the driver, as opposed to the passenger, of a squad car that is involved in a traffic stop. Indeed, the supreme court caselaw suggests that a traffic stop is made by all of the officers who are present at the stop. *See, e.g.*, *Lemert*, 843 N.W.2d at 232 n.3 (describing case in which supreme court "held that the police unlawfully seized the driver of a truck when they stopped the truck"); *State v. Craig*, 826 N.W.2d 789, 791 (Minn. 2013) (stating that "[t]he officers stopped the car"); *State v. Flowers*, 734 N.W.2d 239, 243–44 (Minn. 2007) (referring to "[t]he two officers who stopped [a vehicle driven by defendant]," both of whom were in same squad car); *cf. Conaway*, 319 N.W.2d at 39 (reasoning that "in the context of a suppression motion, the question is whether the law enforcement system as a whole has complied with the requirements of the Fourth Amendment" (quotation

8

omitted)). Officer Taylor's testimony establishes that he was part of a two-officer team that made a traffic stop of the vehicle.

But even if Officer Reilly could be said to have made the traffic stop "alone," Officer Taylor's knowledge that the driver failed to bring the vehicle to a complete stop at a stop sign is imputed to Officer Reilly for purposes of establishing the requisite particularized and objective basis for the stop. The officers sat together in the same squad car, at the same time, and for the same purpose: to fulfill their duty to "uphold[] the law" in the fourth precinct of Minneapolis. On these facts, the collective-knowledge doctrine credits Officer Taylor's independent knowledge of the driver's traffic violation to Officer Reilly, regardless of whether she personally witnessed the violation. *See Lemieux*, 726 N.W.2d at 789. Officer Taylor's testimony therefore shows that both he and Officer Reilly "had a particularized and objective basis for suspecting the [vehicle's driver] of criminal activity"—namely, failing to come to a complete stop at a stop sign. *See Anderson*, 683 N.W.2d at 822–23 (quotation omitted); *see also* Minn. Stat. § 169.30(b) (2012). The traffic stop was justified at its inception on that basis.

Citing this court's opinion in *State v. Rohde*, 839 N.W.2d 758, 764 (Minn. App. 2013), the state asserts that because the vehicle was uninsured, the police were justified in impounding it immediately. But the state fails to note that the supreme court granted Rohde's petition for further review on January 29, 2014. After the submission of briefs but before oral argument in this case, the supreme court reversed our opinion in *Rohde*, concluding that, "in light of the facts . . . that Rohde was not arrested prior to the impoundment [of her uninsured vehicle] and that the vehicle did not pose a safety

9

threat[,] . . . the impoundment of Rohde's vehicle was not justified under the Fourth Amendment." 852 N.W.2d 260, 266 (Minn. 2014). At oral argument in this case, neither party was prepared to discuss the supreme court's opinion in *Rohde*.

We reverse and remand for further proceedings consistent with this opinion and for consideration of the effect, if any, of the supreme court's opinion in *Rohde*.

**Reversed and remanded.**