STATE OF MINNESOTA

IN SUPREME COURT

A15-0769

Dakota County                                                          Anderson, J.
                                                           Took no part, Chutich, J.

State of Minnesota,

                    Respondent,

vs.                                                                Filed: August 24, 2016
                                                              Office of Appellate Courts

Brian George Fitch,

                    Appellant.

_____

Lori Swanson, Attorney General, Saint Paul, Minnesota;

James Backstrom, Dakota County Attorney, Hastings, Minnesota;

John J. Choi, Ramsey County Attorney, Thomas R. Ragatz, Assistant County Attorney, Saint Paul, Minnesota, for respondent.

Melissa Sheridan, Assistant Public Defender, Eagan, Minnesota, for appellant.

_____

S Y L L A B U S

1.     The district court's application of Minn. Stat. § 628.41 (2014) to appellant's case did not violate appellant's right, under Article I, Section 6, of the Minnesota Constitution, to be tried by a jury of the county or district in which the alleged offense occurred.

1

2.    The district court did not commit reversible error by declining to sever the first-degree murder charge from the other charges against appellant.

Affirmed.

O P I N I O N

ANDERSON, Justice

On February 2, 2015, a Stearns County jury found appellant Brian George Fitch guilty of one count of first-degree murder of a peace officer, Minn. Stat. § 609.185(a)(4) (2014); three counts of attempted first-degree murder of a peace officer, Minn. Stat. §§ 609.17, 609.185(a)(4) (2014); and one count of unauthorized possession of a firearm, Minn. Stat. §§ 624.713, subd. 1(2), 609.11, subd. 5(b) (2014). Fitch appealed to our court. On appeal, Fitch claims that his convictions must be vacated on two grounds. First, Fitch argues that the district court violated his right, under Article I, Section 6, of the Minnesota Constitution, to be tried by a jury of the county or district in which the alleged offense occurred. Alternatively, Fitch argues that the district court committed prejudicial error by refusing to sever the first-degree murder charge from the other charges for the purpose of trial. Because Fitch's rights under the Minnesota Constitution were not violated and Fitch was not prejudiced by the district court's refusal to sever the charges, we affirm.

I.

A.

In January 2014 Fitch was placed on supervised release from prison. As a condition of his release, Fitch was required to keep his supervising probation officer informed of his place of residence. On June 2, 2014, Fitch's probation officer contacted the Minnesota

2

Department of Corrections and notified the department that Fitch had violated the terms of his release by failing to keep the probation officer advised of his current address. A warrant for Fitch's arrest was issued based on his failure to comply with the terms of his supervised release.

On July 28, 2014, Fitch's girlfriend, T.M., called the Oakdale Police Department because she and Fitch had been in an argument and she was concerned that Fitch was going to break into her apartment while she was gone. T.M. gave Fitch's name and cell phone number to the Oakdale police. The Oakdale police called the cell phone number that T.M. had provided them, but the person who answered denied that he was Fitch.

T.M. saw Fitch the following day, July 29. Fitch was very upset that T.M. had called the police and given them his name. Fitch said that he was upset because "[the police] forgot about [him], now they're going to remember [him]." Fitch specifically told T.M. that "if [he] were to get pulled over [he would] shoot a cop."

The next day, July 30, at approximately 12:20 p.m., Officer Scott Patrick of the Mendota Heights Police Department activated his squad car's emergency lights and pulled over a green Pontiac Grand Am. The Grand Am belonged to Fitch, but Officer Patrick had no way of knowing this at the time. Fitch had only recently purchased the car from a friend, J.L., and title had not yet been transferred. J.L. testified at trial that Fitch had spent the previous night at his house. J.L. testified further that he saw Fitch at the house on the morning of July 30 and that Fitch's Grand Am was parked outside the house. One of J.L.'s roommates, L.P., testified that Fitch left the house around 11:00 a.m. on July 30, and that

3

when she looked outside a short time later, Fitch's Grand Am was no longer parked in front of the house.

Officer Patrick left his squad car and walked toward the driver's side of the Grand Am. As Officer Patrick approached the driver's side door of the vehicle, Fitch leaned out of the window and fired three rounds with a handgun. Officer Patrick suffered gunshot wounds to his leg, abdomen, and head. After firing at Officer Patrick, Fitch sped away through traffic. Officer Patrick was pronounced dead at 12:58 p.m., not long after he was transported to a hospital emergency room.

Shortly after the Grand Am sped away from the scene of Officer Patrick's murder, Fitch appeared at the house of an acquaintance, J.C., driving the Grand Am. Several eyewitnesses saw a green Grand Am traveling at speeds of 60-75 miles per hour and running stop signs on the route between the scene of Officer Patrick's murder and J.C.'s residence. Fitch asked to borrow a blue Hyundai SUV from J.C.'s mother, and offered to pay the overdue payments on her vehicle if she allowed him to use it for the afternoon. J.C.'s mother allowed Fitch to borrow the SUV and J.C. told Fitch that he could park the Grand Am in the backyard, where J.C. covered it with a blue tarp.

After leaving J.C.'s home, Fitch arrived at K.H.'s residence driving the blue Hyundai SUV. Fitch asked K.H. to pick up one of Fitch's vehicles, which was at a mutual friend's house. K.H. took the keys to the vehicle and went with a neighbor to retrieve the vehicle for Fitch.

Fitch, still driving the blue SUV, met K.H. on her way back with the other vehicle and told her to follow him. They parked the other vehicle on Third Street near White Bear

4

Avenue on the east side of Saint Paul. K.H. then got into the blue SUV with Fitch and they made several stops, including at Dairy Queen, an auto-repair shop, Jimmy John's, and Walgreens. At Walgreens, Fitch gave K.H. cash and asked her to buy him a cell phone and phone card.

After leaving Walgreens, Fitch and K.H. drove to J.K.'s residence on West Sycamore Street in Saint Paul. They arrived "around dark," which J.K. estimated was between 6:00 p.m. and 7:00 p.m. Fitch asked J.K. who else was at the house, told J.K. that he should not let anyone else in the house, and said that everyone should turn off their cell phones. J.K. instructed everyone at his house to remove the batteries from their cell phones.

Fitch had a black handgun equipped with a laser sight with him while at J.K.'s residence. At some point, Fitch, J.K., and D.B.—another acquaintance of Fitch—went into a back room. The three discussed how Fitch could get to D.B.'s cabin in Luck, Wisconsin. D.B. drew a map to the cabin for Fitch on a paper bag.

Fitch told J.H., another acquaintance at J.K.'s residence that evening, that J.H. was going to accompany Fitch to Fitch's vehicle, then return the blue Hyundai SUV to J.C.'s mother. Fitch instructed J.H. to tell anyone who asked that Fitch had gone to Canada. Fitch also warned J.H. that if he told anyone where Fitch was actually going, Fitch would kill his entire family.

Approximately 35 minutes after he arrived, Fitch left J.K.'s residence with K.H. and J.H. Fitch drove the blue Hyundai SUV, J.H. rode in the front passenger seat, and K.H.

5

rode in the backseat. By this time, the police had managed to track Fitch to the Sycamore address. The police chased the blue Hyundai SUV as it left the residence.

Fitch realized that he was being pursued by the police, and numerous police cars joined the chase. The chase wound through the surrounding neighborhood, ending in a parking lot on West Sycamore Street, not far from where the pursuit began. As Fitch was driving the SUV through the parking lot, the vehicle skidded and hit a curb. When the vehicle hit the curb, J.H. unlocked and opened the door to the vehicle. Fitch pointed a gun at J.H., but J.H. pushed Fitch's arm away and was able to escape the vehicle.

After J.H. left, Fitch fired several shots at police officers who had arrived on the scene. A witness testified that he saw several flashes and heard gunshots coming from inside the Hyundai SUV. The witness also testified that the shots from the SUV shattered the driver's side window of the vehicle. Three officers testified that they saw Fitch aim a handgun in their direction, that they saw muzzle flashes as Fitch fired the handgun, and that they believed Fitch was shooting at them.

The police officers at the scene returned fire. The shootout lasted less than a minute. The officers stopped firing when they realized that K.H. was still in the backseat of the vehicle and it appeared that she had been shot. Fitch also indicated that he had been shot, but refused to leave the vehicle. Eventually, Fitch was removed from the vehicle by the Saint Paul SWAT team and his gunshot wounds were treated by medics at the scene.

While processing the scene of the shootout, law enforcement recovered a black handgun with a laser sight that matched the description of the firearm Fitch had been seen with at J.K.'s house. Law enforcement also recovered several shell casings from in and

6

around the Hyundai SUV. Forensics testing by the Bureau of Criminal Apprehension later confirmed that these shell casings matched the handgun with the laser sight. Further analysis confirmed that the handgun with the laser sight fired the bullets that killed Officer Patrick. Finally, DNA testing revealed that Fitch's DNA was the only DNA profile that could be obtained from the black handgun with the laser sight.

B.

Prosecuting Fitch presented venue issues. A Dakota County District Court judge noted that Officer Patrick was killed in Dakota County, but that the shootout with the police, which ultimately led to charges for attempted murder and unauthorized possession of a firearm, occurred in Ramsey County. The State originally charged Fitch by complaint in Dakota County, for the purpose of detention, with two counts of first-degree murder of a peace officer. The Dakota County District Court subsequently issued an order convening a multi-county grand jury, under Minn. Stat. § 628.41, subd. 2 (2014) (authorizing the district court to impanel a grand jury to investigate "activity, events, or other matters in more than one county"), to investigate the circumstances surrounding Officer Patrick's death and the shootout with the police. The grand jury was drawn in reasonable proportion from the populations of Dakota and Ramsey Counties, as required by Minn. Stat. § 628.41, subd. 2. On September 12, 2014, the grand jury returned an indictment charging Fitch with first-degree murder of a peace officer, Minn. Stat. § 609.185(a)(4); three counts of attempted first-degree murder of a peace officer, Minn. Stat. §§ 609.17, 609.185(a)(4); and one count of unauthorized possession of a firearm, Minn. Stat. §§ 624.713, subd. 1(2), 609.11, subd. 5(b).

7

The district court's order impaneling the multi-district grand jury also specified that Dakota County would be the venue for any proceedings if the grand jury indicted Fitch. *See* Minn. Stat. § 628.41, subd. 3 (2014) (providing that "[a]ll indictments . . . returned by a grand jury drawn from more than one county shall be returned without any designation of venue" and requiring "the judge ordering the impaneling of the grand jury [to] designate the county of venue for purposes of trial"). The Dakota County Attorney's office was designated as the prosecuting authority for the case, with assistance from the Ramsey County Attorney's office, in accordance with Minn. Stat. § 628.41, subd. 4 (2014) (providing that the county attorney who requested the grand jury "shall prosecute indictments returned thereby" unless the judge designates another prosecuting authority).

On October 16, 2014, Fitch filed a motion requesting that the district court dismiss the indictment because, among other things, the district court's application of Minn. Stat. § 628.41 (2014) to his case violated his right, under Article I, Section 6, of the Minnesota Constitution, to be tried by a jury drawn from the county or judicial district in which the alleged crime occurred. Fitch argued that the district court was constitutionally required to sever the attempted murder and unauthorized possession of a firearm charges from the first-degree murder charge because the attempted murder and unauthorized possession of a firearm offenses occurred in Ramsey County. At the same time that he brought the motion to dismiss the indictment, Fitch also moved to change venue, claiming that the media coverage of the events surrounding his alleged crimes made it impossible for him to have a fair trial in the greater Twin Cities metropolitan area. Additionally, Fitch moved

8

for severance of the charges under Minn. R. Crim. P. 17.03, subd. 3, and suppression of a statement he made to law enforcement.

The district court granted the motion to change venue on December 2, 2014. The district court found that the media coverage surrounding the case, including the public's exposure to information about Fitch's criminal record, made it impossible for Fitch to obtain a fair and impartial jury in Dakota County. As a result, the district court changed the venue to Stearns County. Later, on December 5, 2014, the district court denied Fitch's motion to dismiss the indictment and sever the charges. The district court concluded that Minn. Stat. § 628.41 was a constitutional exercise of the Legislature's authority to create special-venue statutes, and held that the application of Minn. Stat. § 628.41 to Fitch's case was constitutional. The district court also determined that all of the charges were related to one another and thus joinder was proper under the Minnesota Rules of Criminal Procedure.

The case proceeded to trial in Stearns County. After a full trial, a Stearns County jury found Fitch guilty of all counts. The district court sentenced Fitch to life in prison without the possibility of release for the first-degree murder of Officer Patrick; 216 months in prison, to be served consecutively after the life sentence, for each of the three attempted murders; and 71 months in prison, with credit for 189 days for time served, for the unauthorized possession of a firearm.

Fitch appealed his convictions to our court, raising two issues. First, Fitch argues that the use of Minn. Stat. § 628.41 to combine all of the charges against him into a single case violated his right under the Minnesota Constitution to a trial by a jury from the county

or district in which the alleged offense occurred. Second, Fitch claims that the district court committed reversible error by failing to sever the first-degree murder charge from the other charges in his case. We address each claim in turn.

II.

This case presents a challenge to the constitutionality of a statute, which we review de novo. *State v. Chambers*, 589 N.W.2d 466, 479 (Minn. 1999). "Minnesota statutes are presumed constitutional, and our power to declare a statute unconstitutional should be exercised with extreme caution and only when absolutely necessary." *In re Haggerty*, 448 N.W.2d 363, 364 (Minn. 1989). The party challenging the "constitutional validity of a statute . . . bears the very heavy burden of demonstrating beyond a reasonable doubt that the statute is unconstitutional." *State v. Merrill*, 450 N.W.2d 318, 321 (Minn. 1990); *see also State v. Wolf*, 605 N.W.2d 381, 386 (Minn. 2000) ("The party challenging a statute must demonstrate beyond a reasonable doubt that the statute violates some provision of the Minnesota Constitution.").

Fitch argues that the application of Minn. Stat. § 628.41 in this case violated his rights under Article I, Section 6, of the Minnesota Constitution, which provides in part: "In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the county or district wherein the crime shall have been committed." Fitch claims that the district court's decision to venue the attempted murder charges and the unauthorized possession of a firearm charge (collectively, the Ramsey County charges) in Dakota County violated his right to be tried on those charges in Ramsey County. The State, by contrast, argues that Fitch's right to a trial by a Ramsey County jury for the

10

Ramsey County charges is not absolute and that Minn. Stat. § 628.41 is a constitutional application of the Legislature's power to create "special-venue provisions."

A.

At the outset, it is important to clarify that Article I, Section 6, "does not define or limit the jurisdiction of the courts of this state over criminal offenses." *State v. Robinson*, 14 Minn. 447, 453, 14 Gil. 333, 337 (1869). And, as we have noted, "if a state has jurisdiction over the crime, then a determination of the precise county (venue) for trial is less significant." *State v. Smith*, 421 N.W.2d 315, 320 (Minn. 1988). As a result, the question in this case is a narrow one: did the application of Minn. Stat. § 628.41 to Fitch's case deprive him of his right to be tried "by an impartial jury of the county or district wherein the crime shall have been committed"?

Both parties appear to construe a defendant's right to a trial by a "jury of the county or district wherein the" alleged crime was committed to be a constitutional right to venue in the location where the alleged crime occurred. Although some of our cases have generally discussed this right in terms of venue or the location of trial, *see, e.g.*, *State v. Krejci*, 458 N.W.2d 407, 411 (Minn. 1990) (referring to Article I, Section 6, as a "constitutional provision[] relating to venue"), we recognized early on that Article I, Section 6, does not "expressly, or in effect, guaranty to the accused in all cases a trial in the county in which the offense was committed." *Robinson*, 14 Minn. at 453, 14 Gil. at 337. Rather, the provision "defines and limits the locality from which a jury shall be taken for the trial of the defendant in a criminal prosecution." *Id*.

11

Consequently, Fitch's argument that Article I, Section 6, guaranteed him a judge or prosecuting authority from a particular county is not an accurate description of his constitutional right.[1] Fitch had a constitutional right only to a trial by an impartial jury from a particular county. Any collateral changes to the structure of his case, such as a change in prosecutor or judge, are not constitutionally significant.[2] In short, Fitch's rights under Article I, Section 6, could not have been violated until a jury from a county other than the one in which the alleged offense occurred was impaneled to adjudicate the case against him.

Additionally, we have repeatedly recognized that a defendant's rights under Article I, Section 6, are not absolute. *See Krejci*, 458 N.W.2d at 410-11 (collecting cases and

---

[1] For instance, Fitch's counsel argued at the contested omnibus hearing that Article I, Section 6, should be read to prohibit the Dakota County judge from making decisions regarding the venue of the Ramsey County charges. Fitch's counsel appeared to be operating under the assumption that Article I, Section 6, required the Ramsey County charges to be *venued* in Ramsey County in the first instance and, thus, only a Ramsey County judge could make any decisions about venue. As a result, Fitch argued that the district court should first rule on the severance argument and then rule on the request for a change of venue. At oral argument before our court, Fitch's counsel again appeared to argue that the Dakota County public defenders and the Dakota County judge were constitutionally prohibited from making decisions regarding how to proceed on the Ramsey County charges.

This argument reflects a misunderstanding of the scope of a defendant's rights under Article I, Section 6. Fitch had a right to a jury drawn from a particular location; he did not have a right to a particular venue or judge. Consequently, the Dakota County District Court had the authority to adjudicate questions of venue with respect to the Ramsey County charges.

[2] Similarly, the fact that Fitch was indicted by a multi-county grand jury did not violate his rights under Article I, Section 6. The right to a jury of the county in which the crime was committed is specific to trial and does not apply to grand-jury proceedings.

stating, "This court has recognized since the early years of statehood that the legislature must have some room to expand upon the constitutional provisions relating to venue."). In *Robinson*, for instance, we upheld a statute that stated that crimes committed within 100 rods[3] of a county line could be tried in either county. 14 Minn. at 454-55, 14 Gil. at 338-39. We reasoned that the statute was a necessary exercise of the Legislature's power because "when a crime is committed within one hundred rods of the dividing line . . . it must frequently be very difficult, and often impossible, to ascertain and prove within which particular county it was committed." *Id*. at 451, 14 Gil. at 335.

Similarly, in *Krejci*, we acknowledged that child abuse cases present "special venue problems" because it is often difficult to determine where the offense occurred. 458 N.W.2d at 411. In light of those problems, we upheld a statute that allowed cases of child abuse to be tried either in the county in which the offense was committed or in the county in which the child was "found," concluding that the provision was similar to other special-venue provisions that we had upheld in the past. *Id*.

In 1870, we held that a district court did not violate a defendant's rights under Article I, Section 6, when it changed the venue of the trial based on concerns that the jury pool in the county in which the crime was committed would be biased. *State v. Miller*, 15 Minn. 344, 349, 15 Gil. 277, 282 (1870). The *Miller* court concluded that Article I, Section

---

[3]     A "rod" is an antiquated unit of measurement equal to roughly five yards. The rule addressed in *Robinson* is now found in Minn. R. Crim. P. 24.02, subd. 2, which states: "Offenses committed on or within 1,500 feet (457.2M) of the boundary line between two counties . . . may be prosecuted in either county."

13

6, is merely an affirmation of the common-law right to a jury from the vicinage[4] where the crime was committed. *Id.* at 349, 15 Gil. at 282. We held that, just like the common-law right, the constitutional "right of the defendant to an impartial jury of the county where the act was committed [is] subject to the right of the court to change the place of trial whenever such impartial jury could not be had there." *Id.* This rule makes particular sense in light of the fact that Article I, Section 6, specifies that a defendant has a right to an "*impartial jury of the county or district wherein*" the alleged crime occurred. Minn. Const., art. I, § 6. (Emphasis added.)

Thus, the language of Article I, Section 6, and the weight of our precedent reveal that a criminal defendant has the right to be tried by an impartial jury drawn from the county in which the alleged offense occurred. This right guarantees the defendant only a jury from a particular county or district, not a judge or prosecuting authority from that county or district. Additionally, the right is subject to at least two exceptions. First, the defendant's right can be overcome in situations in which it would be difficult to identify the county or district in which the offense occurred or when other special concerns related to venue are present.[5] *See, e.g.*, *Krejci*, 458 N.W.2d at 410-11; *Robinson*, 14 Minn. at 454-55, 14 Gil. at 338-39. Second, the defendant's right is subject to the district court's power to change

---

[4]     The American Heritage Dictionary defines "vicinage" as "[a] limited region around a particular area; a vicinity." *American Heritage Dictionary* 1929 (5th ed. 2009).

[5]     These principles also animate many of the special-venue provisions in Minn. R. Crim. P. 24.02, which was amended to incorporate many of the Legislature's special-venue statutes into the rules of criminal procedure. *See Wolf*, 605 N.W.2d at 387.

14

venue when an impartial jury cannot be drawn from the county or district in which the alleged crime occurred. *Miller*, 15 Minn. at 349, 15 Gil. at 282.

B.

Fitch's overarching claim is that his rights under Article I, Section 6, were violated because he was denied the opportunity to be tried by a Ramsey County jury on the Ramsey County charges. Specifically, Fitch argues that Minn. Stat. § 628.41, which allowed venue to be set in Dakota County, is unconstitutional because it does not address the same kind of issues as other special-venue statutes that we have upheld. The State responds by arguing that venue in Dakota County was proper and insists that Minn. Stat. § 628.41 is constitutional because it serves the legitimate state interest of preventing serial prosecutions and ameliorates the burden that multiple trials would impose on the victims and witnesses in this case.

It should be noted that Minn. Stat. § 628.41 is not a traditional "special-venue statute," nor is it facially unconstitutional, even under Fitch's view. Although both parties discuss section 628.41 as a special-venue statute, it is not clear that the Legislature had any intent to alter traditional venue rules in cases governed by section 628.41. Section 628.41 does not actually provide guidance regarding where criminal trials arising from indictments returned from multi-county grand juries should be held. Instead, the statute provides that indictments returned by a multi-county grand jury should be returned without any designation of venue. Minn. Stat. § 628.41, subd. 3. The statute then directs the district court judge who impaneled the grand jury to designate the venue of each indictment for trial. *Id*.

15

Generally, a district court's designation of venue under subdivision 3 could and should comply with the defendant's rights under Article I, Section 6, of the Minnesota Constitution and the venue rules found in Minn. R. Crim. P. 24.01-.03. In other words, in most cases, the district court should designate venue for each indictment based on where the alleged offense giving rise to the indictment occurred.

To the extent, if any, that section 628.41 authorizes district courts to designate a venue that conflicts with Article I, Section 6, or Minn. R. Crim. P. 24.01-.03, the reasons advanced by the State for allowing such a designation are insufficient to overcome the constitutional requirement. Because Minn. Stat. § 628.41 is not a traditional special-venue statute, the State's arguments in this case are not related to issues of venue. Instead, the State argues that the special-venue need in this case is "avoiding the stress and trauma of putting the victims, their families, civilian witnesses, and numerous law enforcement officers through two trials with mostly duplicative facts." These reasons have little, if anything, to do with traditional concerns regarding venue and a defendant's rights under Article I, Section 6.

In essence, the State argues that inconvenience to witnesses should be enough to overcome the defendant's constitutional right to trial by a jury of the county or district in which the crime was committed. This argument is not only novel, it is also unpersuasive and troubling. There is no limiting principle for when witness convenience outweighs a defendant's rights under Article I, Section 6, and the State cites no authority for the proposition that constitutional rights are subject to a broad convenience exception. The State also does not cite any other circumstances in which constitutional rights are subject

16

to erosion or elimination altogether based on the convenience of others.[6] On the contrary, constitutional rights may not be disregarded whenever it becomes inconvenient to honor them.

In short, the "special-venue need" that the State advances in this case is simply not the sort of compelling, venue-related interest that we have previously allowed to overcome a defendant's rights under Article I, Section 6. As a result, if section 628.41 were used to designate a venue that conflicted with the defendant's right to be tried by a jury of the county or district where the alleged crime occurred, it is possible that it could be unconstitutional as applied.

C.

But the fact that section 628.41 should not be used to abrogate a defendant's rights under Article I, Section 6, for the sake of witness convenience does not, by itself, resolve this case. We still must determine whether Fitch's rights under Article I, Section 6, were actually violated. We conclude that they were not.

Fitch argues that he had a right to be tried on the Ramsey County charges by a Ramsey County jury. But at the same time that he moved to dismiss the indictment because it violated his rights under Article I, Section 6, Fitch also moved to change the venue for trial.[7] Fitch's memorandum of law in support of his motion to change venue argued that,

---

[6]     Hypothetically, for example, in a case in which all of the principal witnesses lived in Hennepin County but the crime was committed in St. Louis County, the State's argument could justify venue in Hennepin County in order to avoid the stress and inconvenience associated with requiring witnesses to travel to St. Louis County to testify.

[7]     Under different circumstances, a motion to change venue could be deemed a waiver

due to media coverage, "Mr. Fitch will not be able to obtain a fair trial in Dakota County or the Twin Cities media market." Fitch also submitted voluminous exhibits and an affidavit, survey, and report from the President of the National Jury Project, Midwest, all of which indicated that Fitch could not receive a fair trial in the Twin Cities media market.

Over the State's objection, the district court granted Fitch's motion to change venue before deciding Fitch's motion to dismiss the indictment. The district court found that the "case ha[d] generated a large amount of publicity in and around Dakota and Ramsey Counties," concluded that the media coverage made it "difficult if not nearly impossible" to impanel a fair and impartial Dakota County jury, and transferred venue in the case to Stearns County. Fitch was ultimately tried and found guilty by a Stearns County jury.[8]

A defendant's rights under Article I, Section 6, are subject to the district court's authority to change the venue of the trial if an impartial jury cannot be impaneled in the county where the alleged crime occurred. *Miller*, 15 Minn. at 349, 15 Gil. at 282. In this case, by Fitch's own admission, he could not receive a fair trial in a county within the Twin

---

of the right to be tried by a jury of the county or district in which the offense was committed.

In this case, however, Fitch appears to have been asking for a change in venue for the murder charge only—a charge he concedes was properly venued in Dakota County. At oral argument on the motion to change venue, Fitch's counsel clarified that he was asking the court to sever the charges first—sending the Ramsey County charges to Ramsey County—then change the venue for the remaining murder charge. As a result, it does not appear that Fitch intended to waive his right to be tried by a jury drawn from the county or district in which the offenses were committed.

[8]     Fitch does not contend that the jury that ultimately tried him was in any way tainted or biased. Rather, he contends that the jurors for the Ramsey County charges should have been drawn from Ramsey County.

18

Cities media market. In fact, this principle was so important to Fitch that he insisted a transfer to "a county outside the Twin Cities metropolitan media market" was constitutionally essential.

Article I, Section 6, secures only a defendant's right to an "*impartial* jury of the county or district wherein the crime shall have been committed." Minn. Const. art. I, § 6 (Emphasis added.) As a result, Fitch did not have a right to a trial by a Ramsey County jury on the Ramsey County charges because, by his and the court's analysis, he could not have obtained a fair and impartial jury in Ramsey County. Because Fitch, in the circumstances of this case, did not have a constitutional right to a Ramsey County jury, the district court acted within its authority by transferring venue to Stearns County, and Fitch's rights under Article I, Section 6, were not violated.[9] *Miller*, 15 Minn. at 349, 15 Gil. at 282.

## III.

Next, Fitch claims that his conviction must be reversed because the district court committed reversible error by denying his motion to sever the first-degree murder charge from the other charges in his case. Fitch argues that the offenses in this case are separated by too much time and distance to be considered "related" and that, even if the offenses

---

[9]     It is also worth noting that the Rules of Criminal Procedure specify that "[f]or the purposes of change of venue under [Rule 24.03] the district referred to in Minn. Const. Art. I, § 6 is the area within the geographical boundaries of the State of Minnesota." Minn. R. Crim. P. 24.03, subd. 2. Arguably, then, once a district court finds grounds to change venue under Rule 24.03, subdivision 1, as the district court did in this case, a venue transfer to any county within the geographical borders of the State of Minnesota is a transfer that complies with Article I, Section 6.

were related, joining the offenses for trial was unfairly prejudicial. The State responds by arguing that the offenses were related and properly joined because they occurred within 8 hours and 5 miles of one another and involved a common motive or plan. The State also argues that, even if the joinder was erroneous, Fitch's conviction should be affirmed because the joinder was harmless beyond a reasonable doubt.

We review a district court's decision regarding whether to sever charges or offenses de novo. *State v. Kendell*, 723 N.W.2d 597, 607 (Minn. 2006). A district court must sever offenses or charges prior to trial when "the offenses or charges are not related" or "the court determines severance is appropriate to promote a fair determination of the defendant's guilt or innocence of each offense or charge." Minn. R. Crim. P. 17.03, subd. 3. "Offenses are 'related,' and severance is not required . . . if the offenses arose out of a single behavioral incident."[10] *Kendell*, 723 N.W.2d at 607. In determining whether offenses were part of a single behavioral incident, we look to the time and place of the offenses and whether the offenses were motivated by a single criminal objective. *State v. Profit*, 591 N.W.2d 451, 458 (Minn. 1999).

"But 'the ultimate question in a severance claim . . . is one of prejudice.' " *Profit*, 591 N.W.2d at 460 (quoting *State v. Townsend*, 546 N.W.2d 292, 296 (Minn. 1996) (alterations in original)). We have repeatedly and consistently held that joinder is not

---

[10]     This is the same inquiry that we engage in when determining "whether multiple offenses arose from a single behavioral incident for purposes of Minn. Stat. § 609.035." *Kendell*, 723 N.W.2d at 607.

20

prejudicial if "evidence of each offense would have been admissible *Spreigl* evidence in the trial of the other."[11] *State v. Conaway*, 319 N.W.2d 35, 42 (Minn. 1982).

In this case, evidence of the Ramsey County offenses would have been admissible as evidence in a trial for the Dakota County charge in order to establish a consciousness of guilt. *See State v. McDaniel*, 777 N.W.2d 739, 745-47 (Minn. 2010); *State v. Bias*, 419 N.W.2d 480, 485 (Minn. 1988); *State v. McTague*, 190 Minn. 449, 453-55, 252 N.W. 446, 448 (1934). Additionally, some evidence of the Ramsey County offenses may have been admissible in a trial on the Dakota County charge to demonstrate that Fitch was in possession of the firearm that killed Officer Patrick. Similarly, evidence of the Dakota County offense would have been admissible in a trial of the Ramsey County charges in order to establish the motive for engaging in a shootout with the police. *See Kendell*, 723 N.W.2d at 608 n.8 (noting that evidence of prior murder would have been admissible as evidence of motive in a trial for a subsequent murder that was committed in order to avoid apprehension).

Fitch argues that, even if some evidence of each offense would have been admissible at a separate trial of the other offenses, the joinder deprived the district court of the opportunity to parse the evidence under Minn. R. Evid. 403 in order to determine whether the probative value of each piece of evidence might be substantially outweighed by its prejudicial effect. There are several problems with this argument.

---

[11] We use the term "*Spreigl* evidence" to refer to evidence of a defendant's prior bad acts. *See State v. Welle*, 870 N.W.2d 360, 364 (Minn. 2015). *Spreigl* evidence is admissible only under certain circumstances, as specified in Minn. R. Evid. 404(b).

First, the evidence here was overwhelming and the admission of some evidence that may or may not have been excluded had there been separate trials was harmless beyond a reasonable doubt. *See State v. Knight*, 260 N.W.2d 186, 187 (Minn. 1977) (considering the fact that the evidence against the defendant was "very strong" when determining whether joinder was prejudicial). Second, the offenses in this case are so interrelated that evidence of each offense would have been highly probative of the other, and it would have been unlikely that the prejudicial effect of any of the evidence would have substantially outweighed its probative value. *See Kendell*, 723 N.W.2d at 609.

Finally, Fitch's concern is not unique to this case. The same concern regarding whether each individual piece of evidence would have been admissible at separate trials would have been present in *Kendell*, *Conaway*, and *Profit*, each of which concluded that the fact that evidence regarding each offense generally would have been admissible at a trial for the other offenses supported a finding that the joinder was not prejudicial. *See Kendell*, 723 N.W.2d at 608-09; *Profit*, 591 N.W.2d at 460-61; *Conaway*, 319 N.W.2d at 42. We have never engaged in a searching inquiry regarding whether each individual piece of evidence would have been admissible at a trial for the other offenses, and we decline to do so now.

Because Fitch was not prejudiced by the district court's ruling on his severance motion, we need not decide whether the district court erred when it refused to sever the first-degree murder charge from the other charges. Fitch is not entitled to relief based on this claim.

22

IV.

Fitch's rights under Article I, Section 6, of the Minnesota Constitution were not violated in this case. Fitch did not have a right to be tried by a Ramsey County jury on the Ramsey County charges because he could not have obtained a fair trial in Ramsey County. Additionally, Fitch was not prejudiced by the district court's refusal to sever the first-degree murder charge from the other charges. As a result, Fitch is not entitled to relief, and we affirm his conviction.

Affirmed.

CHUTICH, J., not having been a member at the time of submission, took no part in the consideration or decision of this case.

23